**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0152-18T6

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

QUIASIA N. CARROLL,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

November 8, 2018

APPELLATE DIVISION

Submitted October 15, 2018 – Decided  November 8, 2018

Before Judges Koblitz, Ostrer and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Complaint No. W-2018-005075-0408.

Joseph E. Krakora, Public Defender, attorney for appellant (M. Edward Rivas, Assistant Deputy Public Defender, of counsel and on the brief).

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Kevin J. Hein, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Defendant Quiasia N. Carroll appeals from the trial court's order detaining her on charges of fourth-degree cyber-harassment, N.J.S.A. 2C:33-4.1(a)(2), and second-degree retaliation against a witness, N.J.S.A. 2C:28-5(b), as set forth in complaint-warrant W-2018-005075-0408. Because we disagree with the trial court's finding of probable cause as to the former charge, and discern significant legal impediments to successful prosecution of the latter one, we reverse, and remand for reconsideration.

I.

The charges relate to four posts that defendant allegedly made on a Facebook page assigned to a person with the user ID, Klo Kló. For purposes of our discussion, we will assume that defendant is Klo Kló. The posts coincided with and followed the June 21, 2018, conviction of Tyhan Brown, who was charged with murder of a child and the attempted murder of an adult.[1] The State alleges that defendant's posts referred to a prosecution witness at Brown's trial.

In the first post, made on the day of Brown's conviction and accompanied by the witness's photo, the comments were, at least in part, addressed to the witness. In coarse language and slang, defendant called the

---

[1] The record does not reflect the specifics of the jury's verdict.

witness a "rat," and criticized him for lying in return for remuneration, and for being untrustworthy:[2]

> lying ass RAT ass nigga!  fuck you!  I swear I use to tell butt & jo all the time don't trust this nigga!  how tf (the fuck) you go against ya mans for some chump change!!  I'll never respect you!

The next day, defendant posted three more comments, each evidently addressed to the public generally, although we may presume the witness viewed them as well.  In the first, along with the witness's photo, the poster identified the witness by name and nickname.  The comment stated:

> PUBLIC SERVICE ANNOUNCENT RAT ALERT THIS ONE OF THE SCARIEST THINGS EVER THIS NIGGA HOLD GUNS & RUN TO THE COPS NEVER KNOW WHAT HE GOT UP HIS SLEEVE NEXT STAY AWAY FROM THIS RATATOUILLE MICKEY MOUSE STUART LITTLE ASS NIGGA TELL A FRIEND TO TELL A FRIEND [name deleted] AKA SNITCHOS I MEAN [nickname deleted] IS A FUCKING RATTTTTT CHECK HIS SHIRT & HIS PANTS I THINK HE WIRED.

Also that day, defendant posted a photo of two uniformed Camden County Metro Police Officers talking, as they stood in front of an unidentified person in the street.  She added the comment:  "[nickname deleted] really

_____

[2]  We reproduce the posts exactly as presented in the affidavit of probable cause, except, in the exercise of caution, we have deleted the witness's name and nickname.

friends w all the cops" – referring to the witness by what the State alleges is another one of his nicknames.

In the final posting, defendant commented:

> [Nickname deleted] just living his life like it's golden posting pictures & shit w glasses on like he cool BOY YOU A FUCKING RAT! ! ! hope somebody blow them glasses tf (the fuck) off his face

The State alleges that Facebook made it aware of the posts on August 13, 2018. The witness allegedly asked defendant to remove the posts and she refused. The State alleges that the witness feared for his safety and left his home. Defendant was arrested on August 29, 2018. Incident to her arrest, officers allegedly seized drugs on her person, which led to multiple third-degree possession and possession-with-intent-to-distribute charges, and second-degree within-500-feet-of-public-property charges, as set forth in complaint-warrant W-2018-005372-0408. See N.J.S.A. 2C:35-10(a)(1); N.J.S.A. 2C:35-5(b)(3); N.J.S.A. 2C:35-7.1(a).

## II.

The State sought defendant's detention on the retaliation and cyber-harassment charges. The Public Safety Assessment (PSA) stated that, at the time of her arrest, defendant had two pending charges for the disorderly persons offense of hindering, N.J.S.A. 2C:29-3(b)(4), dating from February and September 2016. Her sole prior conviction, in January 2016, was for a

March 2015 disorderly persons shoplifting offense. Defendant failed to appear in court four times, in 2015 and 2016, in connection with the hindering and shoplifting charges. According to a certified driver abstract, defendant also failed to appear in connection with motor vehicle matters three times in 2016 and once in 2018; and her driver's license was suspended through May 2021.

Pretrial Services recommended no release based on an elevated risk score. Defendant scored six on the failure-to-appear scale, and four on the new-criminal-activity scale. The PSA did not include a flag for new violent criminal activity.[3]

Defense counsel contended that defendant's Facebook posts were protected speech under the First Amendment. Counsel questioned whether defendant committed an "unlawful act," which is an element of the retaliation offense. Counsel also argued that the Facebook posts did not include "lewd, indecent, or obscene" statements, an essential element of the cyber-harassment offense charged.

The State responded that the "unlawful act" in the retaliation offense was "making communications which include threats of force via social media."

_____

[3] The PSA erroneously included the retaliation and cyber-harassment charges as "pending charge[s] at the time of offense." See Public Safety Assessment, New Jersey Risk Factor Definitions 3 (Mar. 2018). However, we understand that error did not affect the scores, inasmuch as defendant had the other pending hindering charges.

The prosecutor did not specifically address the defense argument regarding the "lewd, indecent, or obscene" element of cyber-harassment. The prosecutor also asserted that the communications were made during and after the trial, although the affidavit of probable cause asserted that the communications were made on the day of conviction and the next day.

Although the trial court released defendant on Level Three monitoring on the drug-related complaint, the court detained her, upon the State's motion, on the retaliation and cyber-harassment complaint. The court found probable cause that defendant committed the charged offenses. In support of its probable cause finding, the court cited the complaint-warrant and affidavit of probable cause.[4] The court specifically rejected defendant's First Amendment argument, concluding that the Facebook posts did not fall within protected speech. The court did not address the defense argument that defendant's statements were not lewd, indecent, or obscene.

The court found by clear and convincing evidence that no amount of monetary bail, non-monetary conditions, or combination of the two would reasonably assure: defendant's appearance in court when required; the

---

[4]  The court also cited the PSA and the defendant's driver abstract, although their connection to a probable cause finding is unclear.

protection of the safety of any other person or the community; and that the defendant will not obstruct or attempt to obstruct the criminal justice process.

As for the reasons for detention, the court cited: (1) the offenses charged; (2) the weight of evidence against defendant, "to wit, the Facebook postings"; (3) defendant's history and characteristics, including her record concerning appearance at court proceedings; (4) "the nature and seriousness of the danger to any other person or the community should this defendant be released," adding a reference to the drug charges; (5) "the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the defendant's release," noting "potential for witness intimidation Facebook threats – retaliation and cyber harassment during homicide trial"; and (6) Pretrial Services' recommendation of no release, noting the risk scores for failure to appear and new criminal activity.

The court added the following additional reasons:

> This murder case had gang mentions and the key witness was actually relocated to another state based upon fears of retaliation – the statements were not read into the record based upon their nature but were specifically included in the court's determination as a clear threat to the witness or others involved in the homicide case.

On appeal, defendant presents the following points:

I. THE FACTS AS ALLEGED FAILED TO ESTABLISH PROBABLE CAUSE THAT THE DEFENDANT HARMED ANYONE BY AN UNLAWFUL ACT AND NEITHER WAS FORCE EVER THREATENED BY THE DEFENDANT AS REQUIRED BY THE RETALIATION STATUTE. NEITHER DO THE FACTS ALLEGE THAT POSTS OF A LEWD, INDECENT, OR OBSCENE MATERIAL WERE POSTED AS 2C:33-4.1a(2) REQUIRE.

II. EVEN IF THE COURT FOUND PROBABLE CAUSE, BECAUSE MS. CARROLL WAS NOT CHARGED WITH MURDER NOR AN OFFENSE WITH A PO[SS]IBLE LI[]FE SENTENCE, HAD NO INDICTABLE CONVICTIONS, NO VIOLENT CONVICTIONS, NO FINAL DV REST[R]AINING ORDERS, HAD NO PENDING VIOLENT CHARGES, NO JAIL SENTENCES, NO JUVENILE RECORD, AND WAS NOT ON PROBATION OR PAROLE THERE WERE CONDITIONS WHICH COULD HAVE REASONABLY ASSURED THE COURT OF THE GOALS OF THE CJRA AND THE COURT SHOULD HAVE FOUND THAT THE STATE FAILED TO REBUT THE PRESUMPTION OF RELEASE.

Defendant renews her arguments that probable cause was not established, and her statements were protected by the First Amendment.

III.

We review the trial court's decision to detain a defendant for an abuse of discretion. State v. S.N., 231 N.J. 497, 515 (2018). We consider whether the trial court rested its decision on an impermissible basis, or failed to consider relevant factors. Ibid. We are not obliged to defer to "a decision based upon a

misconception of the law." Ibid. (quoting State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017)). We consider de novo issues of law such as statutory interpretation. State v. Pinkston, 233 N.J. 495, 507 (2018); S.N., 231 N.J. at 515. In particular, we are obliged to independently examine whether defendant's speech is protected by the First Amendment. See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 567 (1995) (identifying appellate court's "constitutional duty to conduct an independent examination of the record as whole, without deference to the trial court" in reviewing claim of protected speech).

Applying that standard, we conclude that the trial court misconceived the strength of defendant's legal challenge to the complaint. Defendant's arguments pertain to whether the State has established probable cause that defendant committed the predicate offenses, which is "a prerequisite to extended restraint of liberty." State v. Ingram, 230 N.J. 190, 202, 206 (2017) (quoting Gerstein v. Pugh, 420 U.S. 103, 114 (1975)); N.J.S.A. 2A:162-19(e)(2); R. 3:4A(b)(2). "[I]f . . . the State does not meet its burden of showing probable cause, the defendant must be released . . . ." State v. Dickerson, 232 N.J. 2, 23 (2018).

"To demonstrate probable cause, the State must show the police had a 'well grounded suspicion that a crime ha[d] been committed,' and that the

defendant committed the offense." Ingram, 230 N.J. at 213 (quoting State v. Gibson, 218 N.J. 277, 292 (2014)). The State need produce "'more than a mere suspicion of guilt,' but 'less evidence than is needed to convict at trial.'" Id. at 213-14 (quoting Gibson, 218 N.J. at 292; then quoting State v. Brown, 205 N.J. 133, 144 (2011)). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Pinkston, 233 N.J. at 509 (quoting Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983)).

Defendant's argument also addresses the "weight of the evidence against the eligible defendant," which is a factor in the pretrial detention decision. N.J.S.A. 2A:162-20(b). The "weight of the evidence" factor is another way of evaluating "the strength of the government's case." See State v. Stewart, 453 N.J. Super. 55, 70 (App. Div. 2018) (citing 18 U.S.C. § 3142(g)(1) and (2)). The weight of the evidence factor is important because it reflects upon whether a person is likely to appear, or to pose a danger to a person or the community. See United States v. Motamedi, 767 F.2d 1403, 1408 (9th Cir. 1985) (interpreting analogous "weight of the evidence factor" under federal law, 18 U.S.C. § 3142(g)). Assuming there is probable cause to believe a defendant committed the offense, if the weight of the evidence is weak, then the defendant may be more willing to put the State to the test of a trial, reducing

the risk of a failure to appear.  See State v. Engel, 99 N.J. 453, 460 (1985) (noting that a "fair likelihood" of conviction increases the "urge to abscond") (quoting State v. Konigsberg, 33 N.J. 367, 377 (1960)).

Also, if the weight of the evidence is weak, then a court may conclude it is less likely a defendant actually committed the offense.  That would allow a court to conclude it less likely that the defendant would, if released, pose a danger to the community – assuming the offense involved harm to the community – or pose a threat to the integrity of the criminal justice process – assuming the offense implicated interference with that process.  See United States v. Taylor, 289 F. Supp. 3d 55, 64-69 (D.D.C. 2018) (discussing impact of "weight of the evidence" factor in detention hearing under 18 U.S.C. § 3142(g)(2)).

Whether the State established probable cause necessarily implicates whether defendant's alleged statements alone constitute a crime, since the State has presented no context for the statements, except that they pertained to a State witness at a homicide trial involving an alleged gang member.  Defendant raises statutory and constitutional arguments that the State has not demonstrated probable cause.

Turning first to the statutory contentions, defendant contends the alleged facts do not match the elements of the charged offenses.  The State has

charged defendant with cyber-harassment under N.J.S.A. 2C:33-4.1(a)(2). The offense includes, as an essential element, the posting of "lewd, indecent, or obscene material." Ibid. The statute declares a person guilty of fourth-degree cyber-harassment:

> if, while making a communication in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, the person . . . knowingly sends, posts, comments, requests, suggests, or proposes any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person
>
> [Ibid. (emphasis added).]

The Facebook posts were indisputably coarse and insulting. But, it is difficult to discern how they constitute "lewd, indecent, or obscene material." Notably, the complaint cited N.J.S.A. 2C:33-4.1(a)(2), but omits any reference to the "lewd, indecent, or obscene material" element of the offense. In its brief opposing defendant's appeal, the State asserts only that defendant's posts were "indecent," apparently conceding that they were neither lewd nor obscene.

The Criminal Code does not define "indecent."[5] However, the term is generally associated with nudity or sexuality, as our cases on indecent

---

[5] By contrast, the Code separately defines the offense of lewdness, N.J.S.A. 2C:14-4, and obscene material, N.J.S.A. 2C:34-3(a)(1).

exposure have discussed.  See, e.g., State v. Vogt, 341 N.J. Super. 407, 416 (App. Div. 2001); Borough of Belmar v. Buckley, 187 N.J. Super. 107, 113 (App. Div. 1982).  Chapter 34 of the Criminal Code is entitled "Public Indecency" and includes prohibitions on prostitution, obscenity, sexually oriented businesses, and related crimes.  See N.J.S.A. 2C:34-1 to -7.

In sum, since "indecent" is associated with nudity or sexuality – neither of which appear in defendant's posts – we find not even a well-grounded suspicion that defendant committed cyber-harassment under N.J.S.A. 2C:33-4.1(a)(2).[6]  Therefore, the trial court erred in finding probable cause for the cyber-harassment charge.

Turning to the retaliation charge, the State alleges that defendant has "harm[ed] another by an unlawful act with purpose to retaliate for or on account of the service of another as a witness or informant."  N.J.S.A. 2C:28-5(b).  The complaint alleges that the unlawful act was "making

_____

[6] The State did not charge defendant with cyber-harassment by direct threats, either by threatening to injure or harm a person or property, or by threatening to commit some other crime against a person or property.  See N.J.S.A. 2C:33-4.1(a)(1) (including, as an element of cyber-harassment, "threaten[ing] to inflict injury or physical harm to any person or the property of any person"); N.J.S.A. 2C:33-4.1(a)(3) (including, as an element of cyber-harassment, "threaten[ing] to commit any crime against the person or the person's property"); see also State v. Burkert, 231 N.J. 257, 274 (2017) (stating that "[t]he cyber-harassment statute limits the criminalization of speech mostly to those communications that threaten to cause physical or emotional harm or damage").

communications including threats of force via social media." The threat of force raises the crime to the second-degree. Ibid. We assume, without deciding, the "threat of force" element may be satisfied, even if the speaker does not intend to carry it out personally or to have someone carry it out for the speaker.

However, the State does not identify a Criminal Code provision that would render the alleged "threats of force" an "unlawful act." The State does not contend that the predicate "unlawful act" is the alleged cyber-harassment, which, in any event, we have concluded lacks probable cause. Since we must narrowly construe a provision that criminalizes expressive activity, see State v. Burkert, 231 N.J. 257, 277 (2017), we presume the State will ultimately need to identify the statute that renders the threat of force unlawful. Compare State v. Robinson, 289 N.J. Super. 447, 454-55 (App. Div. 1996) (stating that a jury need not identify which offense a burglar had the "purpose to commit . . . therein," N.J.S.A. 2C:18-2(a), upon unlicensed entry where the burglar's intent was not at issue), with State v. Jenkins, 234 N.J. Super. 311, 315-16 (App. Div. 1989) (stating that in a prosecution under N.J.S.A. 2C:39-4(a), a court must instruct a jury as to the possible unlawful purposes for which a defendant possessed a firearm where possession may also have been for a lawful purpose).

Since the elements of retaliation include both "an unlawful act" and a "purpose to retaliate," N.J.S.A. 2C:28-5(b), in order to establish that the alleged "threat of force" constitutes an unlawful act, the State will need to prove that defendant acted with more than simply a "purpose to retaliate." For example, to render the posts unlawful as a terroristic threat, the State would have to prove defendant intended to terrorize or recklessly disregarded the risk of causing terror, N.J.S.A. 2C:12-3(a).[7] Similarly, to claim the posts were unlawful harassment, which includes threatening to strike, kick, shove or other offensive touching, the State would need to prove a "purpose to harass," N.J.S.A. 2C:33-4(b). By contrast, if the threat of force were made only negligently, without the intent (or reckless disregard) that the witness take it seriously, then it would not be an unlawful act under either of those two provisions.

Moreover, to establish defendant engaged in an unlawful act, the State must show her posts are not protected by the First Amendment. "Speech . . . cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt." Burkert, 231 N.J. at 281. "The First Amendment protects offensive discourse, hateful ideas, and crude language

_____

[7] As discussed below, the Constitution may require a higher mens rea than recklessness.

because freedom of expression needs breathing room and in the long run leads to a more enlightened society." Ibid. The State may not criminalize a person's speech simply because it espouses ideas with which the State disagrees. See ibid. The First Amendment protects the right to coerce action by "'threats' of vilification or social ostracism." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 926 (1982).

"[C]ontent-based restrictions on speech have been permitted, as a general matter, only when confined to the few 'historic and traditional categories [of expression] long familiar to the bar.'" United States v. Alvarez, 567 U.S. 709, 717 (2012) (quoting United States v. Stevens, 559 U.S. 460, 468 (2010)). Included among these are "true threats" and "advocacy intended, and likely, to incite imminent lawless action." Id. at 718; see also Watts v. United States, 394 U.S. 705, 708 (1969) (stating the First Amendment does not protect "true threats"); Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (stating the First Amendment does not protect speech to incite imminent acts of violence); Burkert, 231 N.J. at 281 (stating that the First Amendment does not bar criminalizing "speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct").

A "true threat" includes "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful

violence to a particular individual or group of individuals." <u>Virginia v. Black</u>, 538 U.S. 343, 359 (2003). The First Amendment does not cover true threats so as "to protect[] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." <u>Id.</u> at 360. By contrast, mere hyperbole, even "vehement, caustic, . . . unpleasantly sharp attacks" and "vituperative, abusive, and inexact" speech, are protected. <u>Watts</u>, 394 U.S. at 708.

"Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." <u>Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists</u>, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) (quoting <u>United States v. Orazco-Santillan</u>, 903 F.2d 1262, 1265 (9th Cir. 1990)) (affirming finding that anti-abortion activists engaged in true threats against physicians who performed abortions); <u>see also</u> <u>United States v. Kelner</u>, 534 F.2d 1020, 1026 (2d Cir. 1975) (stating that true threats are "only those which according to their language and context convey[] a gravity of purpose and likelihood of execution"); <u>United States v. Carmichael</u>, 326 F. Supp. 2d 1267, 1281 (M.D. Ala. 2004) (stating the court must consider the context in which the speech is delivered).

Contextual factors include the language itself, and whether it is stated conditionally. Ibid. A court must also consider:

> the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.
>
> [United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996) (citations omitted) (affirming conviction under Freedom of Access to Clinic Entrances Act of 1994 based on true threat).]

We would add that the forum in which the speech is delivered may also provide context. In particular, use of the internet or social media may, depending on the circumstances, amplify the threatening nature of speech or attenuate it.[8]

---

[8] Some argue that use of the internet would tend to place speech outside the scope of a true threat. See Planned Parenthood, 290 F.3d at 1099 (Kozinsky, J., dissenting) (arguing posts threatening abortion providers were not true threats because, among other reasons, their public online nature made them more like "public discourse" and less like "a face-to-face confrontation, a telephone call, [or] a dead fish wrapped in newspaper"); Raymond T. Nimmer, 2 Information Law § 10:78 (West, updated 2018) (arguing threats may have less "immediacy" on the internet). On the other hand, the breadth of the internet audience may increase the likelihood that particular speech will provoke an actor somewhere to violence, thereby causing a reasonable person to fear such a result. See Scott Hammack, The Internet Loophole: Why Threatening Speech On-line Requires a Modification of the Courts' Approach to True Threats and Incitement, 36 Colum. J. L. & Soc. Probs. 65, 81 (2002)

(continued)

Courts disagree about whether an element of a true threat is the speaker's subjective intent to express a serious plan to harm, or an objective intent based on how a reasonable person would understand the statement. In United States v. Bagdasarian, 652 F.3d 1113, 1117-18 (9th Cir. 2011), the court read Black to require a subjective intent – whether "the speaker subjectively intend[ed] the speech as a threat" – as a matter of constitutional law, even if some statutes require, as an additional element, an objective standard addressing the reasonable perception of others. See also United States v. Heineman, 767 F.3d 970, 975, 979 (10th Cir. 2014) (holding that the First Amendment requires proof that the defendant subjectively "intended the recipient to feel threatened" to sustain a conviction under 18 U.S.C. § 875(c)).

On the other hand, some courts have focused on the listener's objectively reasonable reaction, and have required only a speaker's subjective intent to communicate, as opposed to threaten. The Eleventh Circuit held, "[T]he inquiry is whether . . . the defendant intentionally made the statements under such circumstances that a reasonable person would construe them as a serious expression of an intention to inflict bodily harm." United States v. Alaboud,

(continued)
(arguing that the internet's "ability to reach widespread audiences, rapid exchange of information, low cost of use, veil of anonymity, and constantly changing audience make threats posted on the Internet seem more dangerous than the same threats made in an off-line context").

347 F.3d 1293, 1296-97 (11th Cir. 2003) (quoting United States v. Callahan, 702 F.2d 964, 965 (11th Cir. 1983)), overruled on other grounds by United States v. Martinez, 800 F.3d 1293 (11th Cir. 2015) (per curiam).  Similarly, the Fourth Circuit held, "[W]hile the speaker need only intend to communicate a statement, whether the statement amounts to a true threat is determined by the understanding of a reasonable recipient familiar with the context that the statement is a 'serious expression of an intent to do harm' to the recipient." United States v. White, 670 F.3d 498, 509 (4th Cir. 2012) (quoting Black, 538 U.S. at 359), overruled on other grounds by Elonis v. United States, 575 U.S. ___, 135 S. Ct. 2001 (2015).

We are persuaded that both tests should apply.  Consistent with Black, a defendant must intend to do harm by conveying a threat that would be believed; and the threat must be one that a reasonable listener would understand as real.  The court in United States v. Martinez, 736 F.3d 981, 992 (11th Cir. 2013), asserted it would be a rare case in which "speech [is] communicated by a speaker who 'acts with innocent intent, but negligently conveys a message that others [reasonably] find to be threatening.'"  But, given the prevalence of extreme, impulsive, and unfiltered commentary on social media, we think it not so uncommon that a speaker may thoughtlessly post rash or hyperbolic statements, causing others to reasonably fear for their safety.

See Scott Hammack, The Internet Loophole: Why Threatening Speech On-line Requires a Modification of the Courts' Approach to True Threats and Incitement, 36 Colum. J. L. & Soc. Probs. 65, 97-98 (2002) (advocating a test addressing both the subjective intent of the speaker to cause fear and the objectively reasonable reaction of a listener to perceive a serious threat).[9]

A public statement expressly urging unspecified others to violence may be criminalized if it conveys the speaker's own serious intent to inflict harm – otherwise, it is not a threat. In White, 670 F.3d at 505, the court held that posts on a white supremacist website urging the assassination of a civil rights lawyer, whose home address it also provided, were not true threats. While "neither direct communication nor personal or group involvement in the threat" is necessary for a threat to be "true," language "clearly directed to others in the form of advocacy" would not be reasonably interpreted as "serious expressions of intent to commit harm." Id. at 513-14 (citations omitted). A true threat is a "serious expression of intent" to harm, not merely the expression of a "serious desire" that harm should befall someone. Id. at 514. In Bagdasarian, 652 F.3d at 1122, the court held that online posts declaring then-presidential candidate

---

[9] The author finds support in the trial court's opinion in Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists, 41 F. Supp. 2d 1130, 1155 n.1 (D. Or. 1999), aff'd in part and rev'd in part, 290 F.3d 1058 (9th Cir. 2002) (en banc).

Barack Obama "will have a 50 cal in the head soon" and calling for someone to shoot him did not constitute a true threat. The posts did not express an intent to do anything, only a prediction that something would occur and a call for others to act. Ibid.

A reference to the actions of others may constitute a true threat if it is sufficiently detailed and precise, or if the speaker has rallied followers to commit violence by using similar language in the past, so as to imply the person posting will himself either act on the threat or direct others in his control to do so. Compare Claiborne Hardware Co., 458 U.S. at 929 (holding Charles Evers's promise to "break [the] damn neck" of African-Americans patronizing boycotted stores was not a true threat because "there [wa]s no evidence – apart from the speeches themselves – that Evers authorized, ratified, or directly threatened acts of violence," rendering his threat mere advocacy of violence, not expressing Evers's own intent to act), with United States v. Turner, 720 F.3d 411, 413 (2d Cir. 2013) (finding a gun-rights activist conveyed a true threat when he stated on-line that certain judges failed to "take the hint" from an activist's murder of another judge's family); United States v. Wheeler, 776 F.3d 736, 746 (10th Cir. 2015) (holding a post urging "religious followers" to kill certain identified police officers was a true threat

22

because a reasonable person would interpret it as expressing an intent to direct others in the speaker's control to commit violence).

Besides true threats, the First Amendment does not protect speech that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg, 395 U.S. at 447. In contrast to a true threat, which conveys the speaker's own intent either to perpetrate violence or to use his authority to direct others to do so, inciting words exhort others to do violence without signaling the speaker's intent to act. See Wheeler, 776 F.3d at 744-45 (noting that "the line between threats and incitement, especially in cyberspace" may be blurred). Because merely advocating violence is protected, only immediate danger, coupled with the speaker's intent to cause such danger, will remove inciting speech from the First Amendment's protection. Brandenburg, 395 U.S. at 447.

For example, a person may be convicted for urging protestors at an angry demonstration to "get the cop, get the cop," inciting them to attack a police officer who was attempting to arrest another protestor. State v. Hopson, 119 N.J. Super. 84, 85, 89 (App. Div. 1972). However, absent such an imminent response, exhorting others to violence is constitutionally protected. Brandenburg, 395 U.S. at 448-49.

Where a call to others to act neither conveys a plan to act nor is likely to produce imminent danger, it may not be criminalized, despite its unsettling message. In Carmichael, 326 F. Supp. 2d at 1290, the court rejected the government's argument that a defendant's website presented both a true threat and an incitement to violence. The defendant, charged with drug conspiracy and money laundering offenses, identified various persons as "informants" and "agents," included their photographs, and asked the public for information about them. Although the format of the website went through various iterations, at one point, the website included the word "Wanted" in large block red letters, below which appeared the words "Information on these Informants and Agents." Id. at 1272. Eventually, the website included a proviso that the website was not intended "to intimidate or harass any informants or agents, but is simply an attempt to seek information." Ibid.

Focusing on the website's plain language, the court denied the government's request to compel the website's removal. The court distinguished "wanted" posters in other cases that were found to be unprotected, because Carmichael's website did not reference killing, execution or blood, and included no epithets. Id. at 1281-82. Considering context, the court noted that "the general history of informants being killed in drug conspiracy cases" was not enough to convert the website itself into a true

threat.  <u>Id.</u> at 1285.  The court also rejected the argument that the website should be shut down for encouraging others to harm the witnesses or agents, holding the website fell short of the stringent test under <u>Brandenburg</u> and <u>Claiborne</u>.  <u>Id.</u> at 1287-88.

Applying these principles, we doubt that the present record could support a conviction for retaliation, because the posts may be protected by the First Amendment as mere spiteful venting – not true threats or incitement. Nonetheless, at this stage the State need not prove defendant's guilt.  As a threshold showing to detain defendant, the State need only show probable cause, that is, a "substantial chance of criminality," <u>Pinkston</u>, 233 N.J. at 509 (quoting <u>Gates</u>, 462 U.S. at 243 n.13).  Given the proofs required to meet that less demanding burden, we are constrained to affirm the trial court's determination that there is probable cause to charge defendant with retaliation.

There is a "substantial chance" or a "well-grounded suspicion" that defendant intended the witness to believe that someone might respond to defendant's posts by blowing off his glasses or otherwise assaulting him. There is a history of retaliation or intimidation of witnesses against participants in gangs and organized crime.  Unlike in <u>Carmichael</u>, defendant heaped epithets upon the witness and she also referred to an act of violence

A-0152-18T6

against him. She circulated her statements to an apparently broad audience. All it would take is one person to be moved to action against the witness.

These factors are sufficient to raise the charge of retaliation to the low threshold of probable cause. While the State failed to identify the statute rendering defendant's alleged "threat of force" "an unlawful act," the record supports a finding of probable cause that defendant intended either to terrorize, N.J.S.A. 2C:12-3(a), or to harass, N.J.S.A. 2C:33-4(b). The same evidence also shows there is a "substantial chance" the posts are true threats and therefore unprotected.

However, the weight of the evidence of a true threat or incitement is weak. Defendant did not explicitly threaten to harm or exert force against the witness. Rather, she expressed disdain for the witness because he was a "rat" who, she contended, lied for "chump change." Her expressed goal was to socially ostracize the witness by warning people to steer clear of him. Defendant may not have hoped someone would literally "blow" the witness's glasses off his face, any more than someone hopes another person will literally rot in hell. Moreover, expressing a sincere desire by itself is not enough to constitute a true threat.

The State will ultimately need to present more than defendant's statements to persuade a jury beyond a reasonable doubt that defendant's

26

statements were not mere hyperbole. The State must show that a reasonable person would believe that cohorts or allies of defendant would understand her expression of hope as a request or command and would act on it; and that defendant intended that reaction.

Context matters. The State has provided virtually no context for defendant's Facebook statements. Instead, it relies entirely on the statements themselves and the allegation that Brown, against whom the witness testified, was involved in gangs. The record lacks any evidence of a history of violence by defendant; the relationship if any between her and the witness, Brown, or gangs; or the nature of the readership of defendant's Facebook page. There is also no evidence concerning whether or not the witness's identity was publicly known before the posts, or whether other testifying witnesses have been victimized.

While the State alleges defendant's statements are a "call to arms," advocacy of violence is protected speech unless it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg, 395 U.S. at 447. But defendant expressed only the "hope" that someone would blow the witness's glasses off his face; she did not ask or exhort someone to do that. Even urging others to violence is shielded unless the statement is designed and likely to produce immediate action.

27

Tending to disprove such a design and likelihood is that law enforcement learned of defendant's Facebook posts almost two months after they were published, yet no one apparently had answered the alleged "call to arms."

In sum, the State has not presented weighty evidence that defendant's statements were true threats under Watts, or incitements to violence under Brandenburg. On the other hand, the State has established probable cause to charge defendant under N.J.S.A. 2C:38-5(b).

Reversed and remanded for reconsideration. The order of detention remains in force and defendant shall not be released until so ordered by the trial court. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0152-18T6