**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1293-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHAHOUNA DUTTON,

     Defendant-Appellant.

_____

Submitted April 28, 2022 – Decided June 15, 2022

Before Judges Mitterhoff and Alvarez.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-10-0857.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Colleen Kristan Signorelli, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Shahouna Dutton appeals from an October 15, 2019 judgment of conviction sentencing her to four years for witness tampering, N.J.S.A. 2C:28-5(a)(3). We affirm, substantially for the reasons articulated by Judge John A. Young in his thoughtful and well-reasoned opinion.

We discern the following facts from the record. On March 29, 2017, Terrell Smith was shot and killed in Jersey City. During the ensuing investigation, Hudson County Prosecutor's Office (HCPO) detectives spoke to Aladine Hicks, a witness to the shooting, who initially denied knowing the identity of the shooter. In a subsequent statement, however, Hicks identified Shaquan Hyppolite as the shooter. Hicks explained that he did not identify Hyppolite earlier because he feared for his safety. Approximately two-and-a-half weeks before Smith's murder, Hicks had been jumped by some of Hyppolite's associates. After giving his statements to the police, Hicks relocated out of state.

On June 20, 2017, Hyppolite was arrested and charged with Smith's murder. Hyppolite was ultimately indicted for murder and weapons offenses.

In July 2017, a police report outlining Hicks's statement to police was turned over to Hyppolite as part of pretrial discovery. The trial, originally scheduled to begin on February 28, 2018, was adjourned because Hicks refused

to testify. Hicks allegedly refused to testify because, in August 2017, defendant posted a Snapchat video of an unknown person holding a copy of the police report summarizing Hicks's identification of Hyppolite as the shooter. A female voice in the background said "[w]ell, people really be tellin', people be tellin'. That is not right, that is not right."

While Hyppolite was detained, he and defendant had at least seven phone conversations, which were recorded. During these conversations, the pair made repeated references to "L" which HCPO detectives believe was a reference to a man named Tyrone Wilson, who had been murdered a year earlier. "L" apparently stands for "life" and "is a popular [hand] gesture between people like [defendant] and [associates of hers] . . . by the name[s] of 'Eze' Hemingway and Juan Hemingway on Facebook and other social media forms." The hand gesture appeared to be a tribute to Wilson. Hyppolite also had conversations with "Eze" Hemmingway, during which Hyppolite asked if Hemmingway had "put out that document yet."

Hicks was associated with people that defendant's friends thought were responsible for the death of Wilson and believed the attack on him was retaliation for Wilson's death. After defendant posted the Snapchat video,

A-1293-19

Hicks's mother told HCPO detectives that she was fearful for her safety and that of her son.

HCPO obtained a search warrant of defendant's home on February 22, 2018, which produced several electronic devices, two letters from the Hudson County jail, and a handgun.[1] Defendant was arrested and charged with witness tampering. On October 4, 2018, a Hudson County grand jury returned Indictment 18-10-0857, charging defendant with the third-degree witness tampering.

On December 19, 2018, defendant moved to dismiss the indictment. Defendant argued first that the Snapchat post was constitutionally protected free speech that could not be criminalized, and second, that the prosecutor's grand jury presentation was filled with inaccurate or misleading claims. Defense counsel alleged that the prosecutor improperly elicited testimony suggesting defendant was involved in a gang, mischaracterized a telephone conversation between Hyppolite and Hemingway to suggest that they were speaking about a document, and erroneously distorted the timing of events.

---

[1] The handgun found in the search of defendant's home was the subject of a separate federal charge.

A-1293-19

On May 22, 2019, the court entered an order and accompanying written opinion denying defendant's motion. On July 12, 2019, we denied defendant's motion for leave to appeal.

On August 22, 2019, defendant, without waiving her right to appeal from the trial court's May 22, 2019 order, entered into a plea agreement and pleaded guilty to third-degree witness tampering. In exchange, the State agreed to recommend a flat four-year sentence, to run concurrent to her federal sentence. On October 4, 2019, the court sentenced defendant in accordance with the plea agreement. This appeal followed.

On appeal, defendant presents the following arguments for our consideration:

> POINT I
>
> DEFENDANT'S MOTION TO DISMISS THE INDICTMENT SHOULD HAVE BEEN GRANTED BECAUSE HER SNAPCHAT POST WAS CONSTITUTIONALLY PROTECTED FREE SPEECH AND THE STATE'S GRAND JURY PRESENTATION CONTAINED INACCURATE AND MISLEADING CLAIMS THAT PREVENTED THE GRAND JURY FROM MAKING AN INFORMED DECISION.
>
> > A. As the Snapchat Post Was Constitutionally Protected Free Speech, The Indictment Should Have Been Dismissed.

A-1293-19

B. Alternatively, Dismissal Of The Indictment Was Required As The State Made Inaccurate And Misleading Claims During The Grand Jury Presentation That Prevented The Grand Jury From Making An Informed Decision.

We review a trial court's denial of a motion to dismiss an indictment for abuse of discretion. State v. Bell, 241 N.J. 552, 561 (2020) (quoting State v. Twiggs, 233 N.J. 513, 544 (2018)). We will find an abuse of discretion only where "a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). When a trial court's decision turns on a legal question, this court reviews that determination de novo, without deference to the trial court's interpretation. Twiggs, 233 N.J. at 532.

Guiding our review of the denial of a motion to dismiss an indictment is the principle that "[o]nce a grand jury returns an indictment, a court should dismiss that indictment 'only on the clearest and plainest ground, and only when the indictment is manifestly deficient or palpably defective.'" Bell, 241 N.J. at 560 (quoting Twiggs, 233 N.J. at 531-32). Dismissal of an indictment is a "last resort because the public interest, the rights of victims and the integrity of the

criminal justice system are at stake." State v. Williams, 441 N.J. Super. 266, 272 (App. Div. 2015) (quoting State v. Ruffin, 371 N.J. Super. 371, 384 (App. Div. 2004)).

Article I, Paragraph 6 of the New Jersey Constitution provides that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." New Jersey's free speech clause has been interpreted to be co-extensive with the First Amendment. See Twp. of Pennsauken v. Schad, 160 N.J. 156, 176 (1999). "'The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid.'" State v. Fair, 469 N.J. Super. 538, 549 (App. Div. 2021) (quoting R.A.V. v. St. Paul, 505 U.S. 377, 382 (1992)). "The Supreme Court, however, has recognized 'a few limited' categories of speech which may be restricted based on their content, including defamation, obscenity, 'fighting words,' incitement to imminent lawless action, and . . . true threats." Ibid. (citing Virginia v. Black, 538 U.S. 343, 358-59 (2003)). Additionally, this court has previously recognized that New Jersey's witness tampering statue is constitutional because an "important governmental interest" exists in "preventing intimidation of, and interference with, potential witnesses or

informers in criminal matters." State v. Crescenzi, 224 N.J. Super. 142, 148 (App. Div. 1988).

"A 'true threat' includes 'statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.'" State v. Carroll, 456 N.J. Super. 520, 538 (App. Div. 2018) (quoting Black, 538 U.S. at 359). "The First Amendment does not cover true threats so as 'to protect[] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.'" Ibid. (alteration in original) (quoting Black, 538 U.S. at 360). "By contrast, mere hyperbole, even 'vehement, caustic, . . . unpleasantly sharp attacks' and 'vituperative, abusive, and inexact' speech, are protected." Ibid. (alteration in original) (quoting Watts v. United States, 394 U.S. 705, 708 (1969)).

"Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." Ibid. (quoting Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1075 (9th Cir. 2002)). "Contextual factors include the language itself, and whether it is stated conditionally." Ibid.

A court must also consider: "the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence."

[Id. at 538-39 (quoting United States v. Dinwiddie, 76 F.3d 913, 925 (8th Cir. 1996)).]

We are satisfied that Judge Young properly determined that defendant's Snapchat post was not protected speech under the First Amendment or New Jersey's free speech analog. As he explained:

"[N.J.S.A. 2C:28-5] furthers the important governmental interest of preventing intimidation of, and interference with, potential witnesses or informers in criminal matters and easily meets the test of weighing the importance of this exercise of speech against the gravity and probability of harm therefrom." State v. Crescenzi, 224 N.J. Super. 142, 148 (App. Div. 1988) (citing Nebraska Press Ass'n v. Stuart, 427 U.S. 659, 562 (1976)). "When the public interest in discovering the truth in official proceedings is balanced against a party's right to speak to a particular witness with the intent of tampering, that party's right is 'minuscule.'" Id. (quoting State of New Hampshire v. Kilgus, 125 N.H. 739 (1984)). Further, "[w]hether the statements made amount to 'true threats' is a question of fact for the jury." Id. at 147 (quoting U.S. v. Kalevas, 622 F. Supp. 1523, 1527 (S.D.N.Y. 1985)). For example, "[u]ttered in one context, an apparently innocent statement such as, 'I'd be careful crossing the street if I were you' can be merely helpful advice to a

9

senior citizen." Id. at 147-48. However, "[u]ttered in another context it may well be correctly perceived by reasonable persons to be intended as a threat." Id. at 148.

Crescenzi found that defendant's charged offense of witness tampering "easily meets the test of weighing the importance of this exercise of speech against the gravity and probability of harm therefrom." 224 N.J. Super at 148. Defendant's Snapchat post is not protected as an exercise of free speech. In addition, defendant's assertion that "there are no true or imminent threats" in the Snapchat is a question of fact for the jury. See id. at 147 (under N.J.S.A. 2C:28-5, the issue of "[w]hether the statements made amount to 'true threats' is a question of fact for the jury"). Lastly, defendant's contention that her Snapchat account is private and inaccessible to Hicks is unavailing. As discussed above, the "prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime." Hogan, 144 N.J. at 236. Here, the State elicited testimony that both Hicks and his mother had a screenshot of defendant's Snapchat post.

[(alteration in original).]

We likewise reject defendant's claims that the State made misleading statements to the grand jury that improperly influenced its determination. Where a motion to dismiss is based upon prosecutorial misconduct before the grand jury, dismissal is not required "[u]nless the prosecutor's misconduct . . . is extreme and clearly infringes upon the [grand] jury's decision-making function." Bell, 241 N.J. at 560 (alterations in original) (quoting State v. Murphy, 110 N.J.

10

20, 35 (1988)).  Dismissal is only appropriate where "the prosecutor's conduct 'impinge[s] on a grand jury's independence and improperly influence[s] its determination.'"  Id. at 561 (alterations in original) (quoting State v. Francis, 191 N.J. 571, 587 (2007)).

Defendant specifically highlights three statements she argues were inaccurate or misleading.  First, she objects to the following exchange between the prosecutor and HCPO Detective Infantes:

> [Prosecutor]:  There was also phone calls between . . . Hyppolite and "Eze" Hemingway from jail, correct?
>
> [Infantes]:  That's correct.
>
> [Prosecutor]:  And they talked about whether or not . . . Hemingway had put out that document yet, correct?
> [Infantes]:  Correct.
>
> [Prosecutor]:  And that was in conjunction with the video that was then released by [defendant] on Snapchat, correct?
>
> [Infantes]:  Correct.
>
> [Prosecutor]:  And, again, as I said, . . . Hicks has since refused to testify in the upcoming trial against . . . Hemingway, correct?
>
> [Infantes]:  That is correct.

11

Defendant argues that this line of questioning was misleading because it suggests that Hyppolite and Hemingway had discussed releasing the police report outlining Hicks's statement to the police and defendant posted the Snapchat video shortly thereafter. Defendant asserts that "at no time in the recorded calls between Hyppolite and Hemingway did they discuss a 'document.'"

With respect to this exchange, Judge Young observed:

> [j]ust moments prior to this exchange, Det. Infantes testified that defendant posted the HCPO report on her Snapchat account, and that Hicks informed him that he would not testify in Hyppolite's murder trial. The above exchange, then, merely referred the grand jury to Det. Infantes' earlier testimony. Defendant's assertion that the State preempted the grand jury's duty to draw its own conclusions is without merit.

Next, defendant argues that "the prosecutor also suggested to the grand jury through questioning that Hicks's mother had immediately reported the Snapchat post to Infantes and that the post made Hicks fearful and resulted in him refusing to testify" when, in fact, the report was not made immediately. In addressing this argument, Judge Young explained:

> [d]efendant also takes issue with the State's characterization of the timing of Det. Infantes' communications with Hick[s's] mother, Vivian. During testimony, the detective stated that defendant posted the HCPO report. The prosecutor then asked the detective

12

if Vivian contacted him "shortly thereafter . . . [and] communicated to you in no uncertain terms how fearful both she and her son were because of this posting; is that accurate?" Det. Infantes responded, "Correct." According to defendant, Vivian actually contacted Det. Infantes approximately six months after the Snapchat post. The State's alleged misstatement here— "shortly thereafter"— is highly insignificant; it bears no weight on any of the elements in defendant's charged offense of witness tampering. For example, if the prosecutor had instead asked Det. Infantes if Vivian had contacted him "six months later" after the Snapchat post, the outcome of the proceeding would not be different. Defendant is unable [to] demonstrate that such a misstatement was "extreme and clearly infringe[d] upon the grand jury's decision making function." [State v. Murphy, 110 N.J. 20, 35 (1988).]

[(third and fourth alteration in original).]

Finally, defendant argues that "the prosecutor also elicited irrelevant and extraneous information during the grand jury presentation that painted defendant as a person who may be engaged in gang activity." Defendant specifically objects to the following exchange:

[Prosecutor]: And after [Hyppolite] was indicted, he was taken into custody; is that correct?

[Infantes]: Correct.

[Prosecutor]: And there were phone calls that were recorded from . . . Hyppolite to [defendant]; is that correct?

[Infantes]: Correct.

13

[Prosecutor]: At least seven of those phone conversations, correct?

[Infantes]: Yes, sir.

[Prosecutor]: And they reference things along the lines of "L". "L" is for life, correct?

[Infantes]: Yes, sir.

[Prosecutor]: Now, "L" – the "L" kind of hand gesture that I'm showing now is a popular gesture between people like [defendant] and also individuals by the name of "Eze" Hemingway and Juan Hemingway on Facebook and other social media forms, correct?

[Infantes]: That's correct.

[Prosecutor]: And that "L" gesture appears to be a reference to a person that those individuals I just referenced used to denote "Ugly" Tyrone or otherwise known as Tyrone Wilson; is that correct?

[Infantes]: That is correct.

[Prosecutor]: Tyrone Wilson was murdered the year prior, and nearly thereafter, the "L" gesture became popular and they – is also shown in tribute with murals and photos of Tyrone Wilson, correct?

[Infantes]: That is correct.

[Prosecutor]: Those murals, those photos include [defendant] and both "Eze" and Juan Hemmingway; is that correct?

[Infantes]: Correct.

14

A-1293-19

Judge Young rejected defendant's argument on this point explaining:

> [h]ere, the State's grand jury presentation does not in any way demonstrate that defendant was a member of a gang or linked to the murders of "Ugly" Tyrone and Smith. There is no evidence to suggest that defendant's "friends" were affiliated with a gang; that "Eze" and Juan Hemingway were in a gang; that the murder of "Ugly" Tyrone was the result of gang violence; and that the alleged retaliatory killing of Smith was the result of gang violence. Det. Infantes also testified that the "L" hand sign served as a "tribute" to Ugly Tyrone; in other words, the "L" sign was not a gang sign. Further, contrary to defendant's assertions, defendant's posing in photos or murals with certain individuals does not, by itself, "link [defendant] with the murders" of "Ugly" Tyrone and Smith. Defendant's claim that the grand jury presentation was prejudicial or lacking in relevance is without merit.

We discern no error and no abuse of discretion that would require reversal. For the reasons provided by Judge Young, it is clear that the State's conduct was not "extreme" and did not "clearly infringe[] upon the [grand] jury's decision-making function." Bell, 241 N.J. at 560 (alterations in original) (quoting Murphy, 110 N.J. at 35).

To the extent we have not addressed any of defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15                                                A-1293-19