**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0305-21

S.B.B.,[1]

     Plaintiff-Respondent,

v.

L.B.B.,

     Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

September 6, 2023

APPELLATE DIVISION

Argued April 17, 2023 – Decided September 6, 2023

Before Judges Gooden Brown, DeAlmeida and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-1159-21.

Jane J. Felton argued the cause for appellant (Skoloff & Wolfe, PC, attorneys; Jane J. Felton, of counsel and on the briefs; Michaela L. Cohen, Andrew J. Rhein and Steven B. Gladis, on the briefs).

LisaBeth Klein argued the cause for respondent.

Shira Wisotsky argued the cause for amici curiae The American Civil Liberties Union of New Jersey

---

[1]  We use initials to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

Foundation, The American Civil Liberties Union Foundation, The Jewish Orthodox Feminist Alliance, Sanctuary for Families, and Unchained at Last (The American Civil Liberties Union of New Jersey Foundation, and Vera Eidelman (The American Civil Liberties Union Foundation) of the New York and California bars, admitted pro hac vice, attorneys; Shira Wisotsky, Jeanne LoCicero, Sandra S. Park, and Vera Eidelman, on the brief).

Karin Duchin Haber argued the cause for amici curiae The Organization for the Resolution of Agunot, and Shalom Task Force (Haber Silver & Simpson, attorneys; Karin Duchin Haber, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Defendant L.B.B. appeals from the entry of a final restraining order (FRO) entered against her in favor of her estranged husband, plaintiff S.B.B., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The FRO was based on the predicate act of harassment. The communication underlying the trial judge's finding of harassment was defendant's creation and dissemination of a video accusing her estranged husband of improperly withholding a <u>get</u>, a Jewish bill of divorce, and asking community members to "press" her husband to deliver the <u>get</u>. Because defendant's communication constituted constitutionally protected free speech, we reverse.

## I.

We glean these facts from the record. Following a twenty-year marriage that produced four children, the parties, both practicing members of the Orthodox Jewish faith, separated and have been in the process of obtaining a divorce since mid-2019. The process has been contentious and acrimonious[2] and further complicated by a dispute over a get—a religious bill of divorce.

> In the Orthodox Jewish tradition, a married woman cannot obtain a religious divorce until her husband provides her with a contract called a "get" (pluralized as "gittin"), which must, in turn, be signed by an "eid," or witness. A woman who attempts to leave her husband without obtaining a get becomes an "agunah" (pluralized as "agunot"), which subjects her to severe social ostracism within the Orthodox Jewish community. Agunot may seek relief in a "beth din," a rabbinical court presided over by a panel of three rabbis. The beth din may then issue "psak kefiah," or contempt orders authorizing sanctions, which include, but are not limited to, the use of force against a husband to secure a get.
>
> [United States v. Stimler, 864 F.3d 253, 259 (3d Cir. 2017), aff'g United States v. Epstein, 91 F. Supp. 3d 573, 582 (D.N.J. 2015), rev'd in part on other grounds sub nom. United States v. Goldstein, 902 F.3d 411 (3d Cir. 2018).]

---

[2] In April 2020, defendant obtained a temporary restraining order (TRO) against plaintiff. Following a protracted FRO hearing during the COVID-19 pandemic, the TRO was dismissed on March 11, 2021.

A-0305-21

Sometime in March 2021, defendant made a video addressing the get dispute. In the video, defendant asserted plaintiff had refused to give her a get and asked anyone who could to "press" plaintiff to give her a get. On March 19, 2021, after the video was made, plaintiff obtained a TRO against defendant based on a domestic violence complaint alleging harassment. To support the complaint, plaintiff testified at an ex parte hearing that beginning around 3:00 p.m. on March 12, 2021, he received numerous phone calls from unknown numbers, a photograph of himself identifying him as a get refuser and calling on others to "tell him to free his wife," and, ultimately, the actual video defendant had composed.

When plaintiff answered one of the incoming calls, the caller identified himself as being "connected" to various protest "networks" and pressured plaintiff to turn over the get. During his testimony, plaintiff explained his belief that the Jewish community reacts violently to the withholding of a get and that identifying him as a "get refuser" subjected him to kidnappings and brutal beatings. Plaintiff denied withholding the get, claimed he had given the get to the Chief Rabbi of Elizabeth in June 2020, and averred that he was "terrified" of being "harm[ed]" by the "people . . . calling [him]" in response to defendant's accusation and plea in the video. To further support his complaint, plaintiff recounted a history of emotional abuse largely by name-calling

A-0305-21

throughout the course of the marriage.  Subsequently, on March 25, 2021, plaintiff amended the TRO to add cyber harassment as a predicate act.

Defendant moved to dismiss the TRO, arguing any alleged dissemination by defendant was protected free speech.  Relying on State v. Burkert, 231 N.J. 257 (2017), the trial judge denied the motion.  On April 8, 2021, an FRO trial was conducted via Zoom, during which plaintiff and defendant testified.  Both parties were represented by counsel.

During his testimony, plaintiff confirmed that he and defendant were separated.  He lived with his parents while defendant remained in the marital home with their children.  He testified that he received a call on Friday, March 12, 2021, around 3:00 p.m., on the FaceTime videoconferencing app.  Plaintiff did not answer, but was able to see that thirty separate phone numbers had joined the call, none of which were familiar to him.  The group attempted to call back roughly ten more times before plaintiff put his phone in airplane mode.  About half an hour later, when he turned his reception back on, the calls resumed.  Initially, the calls seemed "weird," but then plaintiff became "alarmed" by the calls.  Plaintiff continued to ignore the calls and blocked the associated numbers.

Two days later, on March 14, 2021, plaintiff received a message from his sister in Israel.  The message contained a photo of himself that he had

posted as his "status" on the WhatsApp messaging app. Above the photo was written:

> This man has refused to give his wife a get. His name is [S.B.B.]. He is holding his wife chained for over a year and a half. He lives in Elizabeth NJ. If you see him, tell him to free his wife. #FREE[L.B.B.].

In addition to his sister, plaintiff received the photo from one other person he knew.

When plaintiff saw the photo, he was "shock[ed]," "embarrassed," and "scared." Plaintiff explained that the photo would give community members the impression that he was "a get refuser" which "[could] be dangerous for [him]." Plaintiff testified that he had witnessed his father "[getting] beat[en] up" because "he was a get refuser." Additionally, plaintiff denied the accusation and was adamant that he was not a get refuser, having given the get to the Chief Rabbi of Elizabeth. His "understanding" was that the get would be provided to defendant "within [twenty-four] to [forty-eight] hours after the civil divorce [was] done in court." He also suggested that the Chief Rabbi had the discretion to give the get to defendant at any time. He explained his view that only a "beth din" could declare someone a get refuser.

Between March 14 and 15, 2021, plaintiff received numerous communications, including approximately ten "private or anonymous" calls, none of which he answered. In addition to the anonymous calls, on the

afternoon of March 14, 2021, plaintiff received a message on WhatsApp from the Chief Rabbi's son. The message contained a video showing defendant speaking to the camera, saying:

> Hi. My name is [L.B.B.]. I'm a mother of four children and I live in the United States without any family for the last seventeen years. In August 2019, my husband left the house and we're trying to get an agreement. We still did not get any of that. I tried to reach . . . the community Rabbi[] for help, and he said he will, and he got the get from my husband, but he is holding it for over a year now. The only way [the Chief Rabbi] can give it to me is by my husband permission. I'm seeking for help. I'm asking whoever can, please help me. To press [the Chief Rabbi] to let go of my get or to press my husband to give [the Chief Rabbi] the proof to give me the get. To release the get. Please, I really need this help. I want this get. I want this nightmare to be behind me. Whoever gonna help me, bracha[3] on his head.

Several friends also sent the video to plaintiff. Plaintiff believed defendant posted the video "[b]ecause she wanted people to press [him] to give her a get." When specifically asked what he thought his wife meant by asking people to "press" him for the get, plaintiff answered:

> It can be anything. If we go by Jewish rules, old rules . . . . [y]ou take him, get him and beat him up until he says I will give it, the get. That's the old Jewish law about it. And people take action. Today it

---

[3] Bracha translates to "blessing." Joyce Eisenberg & Ellen Scolnic, Dictionary of Jewish Words 21 (2006).

starts with protesting and then it gets to harming people that are <u>get</u> refusers.

At 10:21 p.m. on March 15, 2021, plaintiff received another call. This time, thinking the phone number looked "familiar," he answered. Plaintiff testified the caller introduced himself as "Hiam" and said he was "calling about the <u>get</u>." He identified himself as someone who "[knew] a lot of people" and was part of "different networks." According to plaintiff, Hiam told him if he did not give his wife a <u>get</u>, they would "come and protest next to [his] house." Hiam added "you know what happen[s] otherwise if you don't give a <u>get</u>." After Hiam refused to explain how he obtained plaintiff's phone number, plaintiff hung up. Plaintiff testified that, a moment later, Hiam called back, screaming at plaintiff and telling plaintiff he wanted "to meet [him]." Plaintiff hung up again. Plaintiff testified he felt threatened by Hiam's call, which, in conjunction with the FaceTime calls, the photograph, and the video, made plaintiff "very scared." Plaintiff specified that although he was not afraid of defendant in her individual capacity, he was afraid of "others . . . influenced by her."

Plaintiff also testified about a history of verbal abuse throughout the twenty-year marriage. He recounted unspecified instances throughout the marriage when defendant had stated during arguments that he was "nothing,"

8

"a zero," or "not good," all of which made him feel "like a worthless person." According to plaintiff, the last such instance occurred "in 2019."

At the end of plaintiff's case in chief but before defendant testified, defendant moved for a directed verdict. See R. 4:37-2(b). The judge denied the motion. Thereafter, defendant testified through an interpreter that it was not her intent to harass plaintiff. She testified that she did not create the "#FREE[L.B.B.]" photo image and had no part in posting either the video or the photo on social media. Additionally, she was not part of any of the calls to plaintiff and did not know who made them. Defendant testified that the first time she saw the "#FREE[L.B.B.]" photo image was when a friend sent it to her, but acknowledged she was not concerned by the photo image. She also admitted creating the video around March 6, 2021, at the request of a rabbinical judge, and claimed she only sent the video to the rabbinical judge. She explained that "under [the Jewish] religion [the rabbinical judges] are to press on the husband to give the get."

On cross-examination, defendant acknowledged that she also sent the video to a therapist "friend" but was reluctant to divulge the friend's name and contact information for fear of "potential retribution." Defendant explained she did not believe that accusing plaintiff of withholding a get in the video would put him in danger of being threatened or hurt. When questioned about

9                                                                      A-0305-21

plaintiff's father's get refusal, defendant testified she was not aware of him being attacked. Rather, it was her understanding that he had "sat in jail" as a result of the refusal.

Following the trial, on April 22, 2021, the judge granted plaintiff an FRO. Among other things, the FRO continued the restraints contained in the TRO, which barred defendant from having "any oral, written, personal, electronic, or other form of contact or communication with [p]laintiff," and specifically ordered defendant to "remove any and all posts from all social media platforms requesting the 'get'" and "cease and desist . . . creating and posting on all social media platforms."

In an oral decision supporting the issuance of the FRO, the judge found plaintiff credible and defendant not credible based on "demeanor," "body language," and the content of the testimony. Specifically, the judge remarked that plaintiff's "demeanor was straightforward," "[h]e didn't embellish" his testimony, "[h]e didn't fidget" while testifying, and his "testimony ma[de] sense." Conversely, according to the judge, defendant's "testimony didn't make much sense," particularly since she claimed she made the video for the rabbinical judges but addressed the plea in the video to anyone who could help

10

her. Additionally, the judge pointed out that during questioning, defendant was "looking all over the room" and "there was a blank look in her face."[4]

Based on her credibility assessment, the judge found defendant "created the video" and "sent it to the community," rather than "the rabbi," in order "to get the get." Applying the elements of subsection (a) of the harassment statute, N.J.S.A. 2C:33-4(a), to her factual findings, in accordance with the first prong of Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), the judge concluded plaintiff "met [his] burden by a preponderance of the evidence" of proving that defendant committed harassment. Specifically, the judge found that "while the end result" of making the video and sending it out into the community "might have been to get her get . . . , the way in which [defendant] went about getting that get was with a purpose to press, harass, annoy, [and] alarm [plaintiff]."

The judge also found that the communication was "invasive" of plaintiff's privacy, as proscribed by N.J.S.A. 2C:33-4(a). See State v. Hoffman, 149 N.J. 564, 583 (1997). Specifically, the judge found that because the video was sent to "the Jewish community,"

---

[4] At the outset, the judge noted that although she had previously denied defendant's application for an FRO against plaintiff, the judge was not influenced by her prior decision. In any event, there was no request for recusal.

the purpose of that communication was to infringe upon [plaintiff's] legitimate expectation of privacy not to . . . hav[e] . . . phone calls or . . . people come to the house or picket or call or threaten. But that was the purpose because in that community, that's what happened. You either go to jail, [or] you get beat when you're a get refuser.

So putting that video and telling people to press her husband, to press him for that get, under the totality of the circumstances is a clear intrusion into []his expectation of privacy and safety.

Critically, the judge rejected defendant's free speech claims, explaining that "one cannot hide behind the First Amendment when that communication is invasive of the recipient's privacy. The First Amendment cannot protect this kind of communication to incite, which is clearly invasive of [plaintiff's] safety and privacy." In assessing the threat to plaintiff's safety associated with being labeled a get refuser, the judge noted:

Now there was no expert that came into this court to explain what a get is or the realities of the get. This [c]ourt is not taking judicial notice of . . . what a get refuser is. But in listening to the testimony of both parties it's clear that it is something serious in the Jewish community. [Plaintiff] testified that he watched his father be beaten because he was a get refuser. And I believe . . . defendant testified . . . that you can go to jail for being a get refuser.

So the [c]ourt does glean from the testimony that being a get refuser in the Jewish community is a very serious allegation with substantial consequences, which is clear from the testimony under the totality of this case.

A-0305-21

Because the judge found that plaintiff had proven the predicate act of harassment based solely on the video, the judge elected not to address the predicate act of cyber harassment.

Next, applying the second Silver prong and N.J.S.A. 2C:25-29(a), the judge found that an FRO was "necessary to protect . . . plaintiff from this continued behavior, . . . [and] from having . . . defendant incite the community that her husband is a get refuser, which clearly puts him in a very dangerous position."  In her analysis, the judge once again relied on her understanding that it "can incite violence when you call someone a get refuser."  The judge noted that "[t]he existence of immediate danger to person or property" was "clear" because when "[y]ou tell the Jewish community that your husband is a get refuser," then "he is subject to danger period or imprisonment."

The judge explained that although plaintiff stated he was "not necessarily in fear of defendant herself," he was "in fear of th[e] continued invasion of his privacy and his safety . . . at the hands of [defendant] by her actions" and "people are entitled to feel safe" and "to be free of this continued abuse."  The judge also found that "[t]he best interest" of plaintiff and the parties' children would be served by awarding the FRO because a third party "acting on defendant's request while the children [were] present . . . would put not only . . . plaintiff, but the children in danger."  Although the judge did not

13

find that the previous history of domestic violence over the years "shed[] much light on the Silver decision," under "the totality of the factors," the judge determined a restraining order was warranted.

Defendant moved for reconsideration. In support, defendant submitted a May 11, 2021, certification from Rabbi Daniel Shevitz, "an expert trained in the laws of Jewish divorce." Shevitz opined that defendant is an "agunah" or "chained woman." He explained that:

> In the Jewish tradition, once the marital bond has failed and the couple is no longer living together as husband and wife, the husband is obliged to write and deliver a get. Until then, the wife is not free of her marital responsibilities. . . . Any delay in granting the get causes her to be "chained" to a marriage in form only and is, in my opinion, a form of abuse.

He further explained that even rabbinical courts lack the power to force a husband to grant a get and that as a result of the husband's unchecked authority, some men use get withholding as a form of extortion. Referring to a March 5, 2020, text message exchange between the parties, which showed plaintiff telling defendant that he would only issue the get if she first signed a divorce settlement agreement, Shevitz suggested that just such extortionist behavior might be occurring in this case.

Shevitz stated that in the quest to obtain a get from an intractable husband, "[f]or centuries, the only tool at the wife's disposal was invoking

14

public sympathy and pleading her case to the broader community." He added that in recent years, "agunot (the plural of 'agunah') have turned to social media with messages asking for community support" in a "'social justice movement' designed to liberate women . . . using one of the only tools they have at their disposal—their voices." He opined that the video created by defendant was "precisely" such an attempt and appended an article to his certification supporting his opinion.

Defendant also submitted her own certification, in which she explained that plaintiff has not authorized the Chief Rabbi "to deliver the get until [she] agrees to his settlement demands" and "she felt [her] only reasonable recourse was to seek public sympathy to obtain a get." She added that her understanding, as someone whose first language was not English, was that "'press' does not mean 'physically harm'" and she "never meant it that way." She acknowledged that "there have been news reports and federal lawsuits" about "those who do physically harm get-refusers," but stressed that she had "never been a part of that."

Following oral argument, on August 27, 2021, the judge denied defendant's motion as not meeting the standard for reconsideration. See R. 4:49-2. In a written opinion, the judge pointed out that Shevitz's certification could have been presented at the time of the initial hearing.

15

Further, the judge found that whether defendant "is or is not an <u>agunah</u> under Jewish law" and whether plaintiff "did or did not satisfy the giving of the [g]et" were irrelevant. The judge also awarded plaintiff attorney's fees and costs in the amount of $10,035 as compensatory damages. <u>See</u> N.J.S.A. 2C:25-29(b)(4).

In this ensuing appeal of the April 22, 2021 and August 27, 2021 orders, defendant raises the following points for our consideration:

> POINT ONE
>
> THIS COURT MUST APPLY A HEIGHTENED STANDARD OF REVIEW. (NOT RAISED BELOW).
>
> POINT TWO
>
> THE FIRST AMENDMENT PROTECTED DEFENDANT'S FREEDOM TO MAKE AND DISSEMINATE THE VIDEO.
>
> > A. The Video Is Protected Speech Under The First Amendment.
> >
> > B. Nothing Defendant Said Or Did Is Punishable As Incitement.
> >
> > C. Affirming The Trial Court In This Case Would Render The Harassment Statu[te] Unconstitutionally Overbroad And Vague.
> >
> > D. The FRO Is An Impermissible Prior Restraint On Defendant's Future Speech.

E.   The FRO Violates Defendant's Right To Freely Exercise Her Religion.

POINT THREE

INDEPENDENT OF CONSTITUTIONAL CONCERNS, DEFENDANT'S VIDEO WAS NOT HARASSMENT.

A.   The Manner In Which Defendant Communicated Did Not Violate The Harassment Statute.

B.   The Video Did Not Intrude Into Plaintiff's Reasonable Expectation Of Privacy, And The Trial Court's Finding To The Contrary Was Based On An Unsubstantiated, False, And Prejudicial Characterization Of The Orthodox Jewish Community.

C.   The Trial Court Found That Defendant Had A Legitimate Purpose In Making The Video – i.e., To Get A Get.

D.   The Trial Court Failed To Consider The Totality Of The Circumstances, As Our Law Requires.

E.   The Trial Court Prejudicially Found Defendant Had A "Purpose To Harass" Before Even Hearing Defendant Testify.

F.   The Trial Court Erred By Allowing Plaintiff To Pursue A Defamation Claim Artfully Pleaded As Harassment.

17

POINT FOUR

THE TRIAL COURT MISSTATED AND MISAPPLIED THE <u>SILVER</u> TEST, AND THE PREREQUISITES FOR AN FRO WERE NOT MET.

    A.   The Court Did Not Address The N.J.S.A. 2C:25-29(a) Factors As The Law Required.

    B.  The Trial Court Misapplied <u>Silver</u> By Allowing Plaintiff's Alleged Subjective Fear To Dictate Whether An FRO Was Necessary.

    C.   The FRO Was Not Necessary To Protect Plaintiff.

POINT FIVE

THE TRIAL COURT'S COUNSEL FEE AWARD VIOLATED THE ENTIRE CONTROVERSY DOCTRINE AND WAS AN ABUSE OF DISCRETION.

We subsequently granted motions by seven organizations to appear as amici curiae and participate in oral argument in support of defendant's position. The organizations are: (1) the American Civil Liberties Union of New Jersey; (2) the American Civil Liberties Union; (3) the Jewish Orthodox Feminist Alliance; (4) Sanctuary for Families; (5) Unchained at Last; (6) the Organization for the Resolution of Agunot; and (7) Shalom Task Force.

II.

Our scope of review in these matters is well-established. We generally defer to the trial judge's findings of fact "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). In particular, we "review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 413).

However, in cases implicating the First Amendment, we must "conduct an independent examination of the record as a whole, without deference to the trial court." Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc., 515 U.S. 557, 567 (1995) (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)); see also Ward v. Zelikovsky, 136 N.J. 516, 536-37 (1994) (applying the same rule in New Jersey). This obligation springs from the reality that the ultimate constitutional decision before the court is inextricably intertwined with the underlying facts, and so the court cannot render a decision on the constitutional question without examining the facts. Ibid. Thus, it is incumbent upon us to "'make an independent examination of the whole record,' to ensure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Ward, 136

19

N.J. at 536-37 (quoting Milkovich v. Lorain J. Co., 497 U.S. 1, 17 (1990)); see also State v. Carroll, 456 N.J. Super. 520, 532 (App. Div. 2018) (applying the same standard to Facebook posts to determine "whether [the] defendant's speech is protected by the First Amendment" in a cyber harassment and witness retaliation prosecution); Rutgers 1000 Alumni Council v. Rutgers, 353 N.J. Super. 554, 567 (App. Div. 2002) ("Independent review of the record below is required because this case involves a First Amendment question.").

While the presence of First Amendment issues diminishes a reviewing court's deference to a trial court's general fact-finding, the specific deference owed to the trial court's credibility findings remains unchanged. Hurley, 515 U.S. at 567 (citing Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688 (1989)). "Appellate courts owe deference to the trial court's credibility determinations . . . because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). However, "[a] more exacting standard governs our review of the trial court's legal conclusions." Thieme, 227 N.J. at 283. Indeed, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of

Manalapan, 140 N.J. 366, 378 (1995)).  "Accordingly, we review the trial court's legal conclusions de novo."  Thieme, 227 N.J. at 283.

In order to grant an FRO under the PDVA, a trial court must make certain findings pursuant to a two-step analysis delineated in Silver, 387 N.J. Super. at 125-27.  First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred."  Id. at 125. Harassment, N.J.S.A. 2C:33-4, is among the enumerated predicate offenses. N.J.S.A. 2C:25-19(a)(13).

Second, if the court finds that the defendant has committed a predicate act of domestic violence, the court must then determine whether it "should enter a restraining order that provides protection for the victim."  Silver, 387 N.J. Super. at 126.  In making that determination, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in [N.J.S.A. 2C:25-29(a)(1) to (6)], to protect the victim from an immediate danger or to prevent further abuse."  Id. at 127.  The statutory factors include "[t]he previous history of domestic violence . . . ;" "[t]he existence of immediate danger to person or property;" "[t]he financial circumstances of the [parties];" "[t]he best interests of the victim and any

21                                                      A-0305-21

child;" and "[t]he existence of" an out-of-state restraining order. N.J.S.A. 2C:25-29(a).

Here, the judge's finding of the predicate act of harassment in violation of N.J.S.A. 2C:33-4(a) was based exclusively on defendant's creation and dissemination of the video. A person commits harassment if, "with purpose to harass another, he [or she] . . . [m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a).

> A violation of subsection (a) requires the following elements: (1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.
>
> [Hoffman, 149 N.J. at 576.]

Our courts have decreed that N.J.S.A. 2C:33-4(a) "does not proscribe mere speech, use of language, or other forms of expression." State v. L.C., 283 N.J. Super. 441, 450 (App. Div. 1995) (citing State v. Fin. Am. Corp., 182 N.J. Super. 33, 36-38 (App. Div. 1981)). No statute could do so, as "[t]he First Amendment to the federal Constitution permits regulation of conduct, not mere expression." Ibid. (citing State v. Vawter, 136 N.J. 56, 65-67 (1994)); see,

22

e.g., Murray v. Murray, 267 N.J. Super. 406, 410-11 (App. Div. 1993) (holding that words alone, without "purposeful alarm or serious annoyance," were insufficient to sustain a domestic violence restraining order for harassment).

Instead, "the substantive criminal offense proscribed by subsection (a) 'is directed at the purpose behind and motivation for' making or causing the communication to be made." Hoffman, 149 N.J. at 576 (quoting State v. Mortimer, 135 N.J. 517, 528 (1994)). Thus, "purpose to harass is critical to the constitutionality of the harassment offense." R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)); see also D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994) (reversing an FRO issued against a father who made a threat to beat up the mother's boyfriend because the defendant's purpose "was to dissuade plaintiff's boyfriend from inflicting further corporal punishment upon his child" rather than to harass the plaintiff).

"A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." N.J.S.A. 2C:2-2(b)(1). A defendant's "mere awareness that someone might be alarmed or annoyed is insufficient." J.D. v. M.D.F., 207 N.J. 458, 487 (2011) (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). Likewise, a "victim's subjective reaction alone will not

23                                                      A-0305-21

suffice; there must be evidence of the improper purpose." Ibid. (citing State v. Washington, 319 N.J. Super. 681, 691-92 (Law Div. 1998)); see Franklin v. Sloskey, 385 N.J. Super. 534, 544 (App. Div. 2006) (concluding that the evidence established only a "dispute between a couple in the midst of a breakup, disagreeing over the future of their unborn child" rather than intent to harass). Still, "[a] finding of a purpose to harass may be inferred from the evidence presented," and "[c]ommon sense and experience may inform that determination." Hoffman, 149 N.J. at 577.

The judge found that by creating and disseminating the video, defendant communicated in a manner proscribed by N.J.S.A. 2C:33-4(a) with a purpose to harass plaintiff. Further, according to the judge, defendant's communication was not protected by the First Amendment. The judge's holding was predicated on her determination that being identified as a get refuser was inherently dangerous and defendant's purpose in asking members of her community to "press" plaintiff to give her a get was to incite violence. Conversely, defendant argues that in creating and disseminating the video, she engaged in constitutionally protected speech. She contends her speech did not rise to the level of incitement and thus retained its constitutional protection under the First Amendment.

Subsection (a) of the harassment statute "is 'aimed, not at the content of the offending statements but rather at the manner in which they were

communicated.'" Id. at 583 (quoting Fin. Am. Corp., 182 N.J. Super. at 39-40). Indeed, "[m]any forms of speech . . . are intended to annoy. Letters to the editor of a newspaper are sometimes intended to annoy their subjects. We do not criminalize such speech, even if intended to annoy, because the manner of speech is non-intrusive." Ibid.

Here, the judge found that the manner of communication fell under the so-called "catchall provision" of subsection (a) in that it was made in "any other manner likely to cause annoyance or alarm." Id. at 581-83; N.J.S.A. 2C:33-4(a). In order to protect against unconstitutional vagueness and overbreadth in the statute, the phrase "any other manner likely to cause annoyance or alarm" has been interpreted narrowly. Hoffman, 149 N.J. at 581-83. In Hoffman, our Supreme Court explained that the three enumerated modes of prohibited communication proscribed under the harassment statute—anonymous, at extremely inconvenient hours, and in offensively coarse language—each "can be classified as being invasive of the recipient's privacy." Id. at 583. Likewise, the Court concluded that "the Legislature intended the catchall provision of subsection (a) [to] encompass only those types of communications that also are invasive of the recipient's privacy." Ibid. Thus, in order to satisfy the catchall element, a communication must "intolerably

25

interfere with a person's reasonable expectation of privacy."  <u>Burkert</u>, 231 N.J. at 283.

Critically, "[l]aws may 'not transgress the boundaries fixed by the Constitution for freedom of expression.'"  <u>Id.</u> at 275 (quoting <u>Winters v. New York</u>, 333 U.S. 507, 515 (1948)).  Thus, as with any speech-regulating statute, the reach of N.J.S.A. 2C:33-4 is cabined by the federal and state constitutions.  The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble."  Similarly, Article I, Paragraph 6, of the New Jersey Constitution proclaims in part that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech or of the press."

> So greatly do we in New Jersey cherish our rights of free speech that our Constitution provides even broader protections than the familiar ones found in its federal counterpart.  In preserving and advancing those broad constitutional commands, we have been vigilant, jealously guarding the rights of the people to exercise their right to "freely speak," although their message may be one that is offensive to some, or even to many, of us.
>
> [<u>Borough of Sayreville v. 35 Club L.L.C.</u>, 208 N.J. 491, 494 (2012) (citation omitted) (quoting <u>N.J. Const.</u> art. I, ¶ 6).]

As such, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." Burkert, 231 N.J. at 281 (quoting Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001)). "Speech . . . cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt." Ibid. "The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and in the long run leads to a more enlightened society." Ibid. To that end, the right to free speech also includes the right to exhort others to take action upon that speech. "It extends to more than abstract discussion, unrelated to action." Thomas v. Collins, 323 U.S. 516, 537 (1945) ("'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts."). In fact, "[t]he First Amendment protects the right to coerce action by 'threats of vilification or social ostracism.'" Carroll, 456 N.J. Super. at 537 (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 926 (1982)).

In Claiborne Hardware Co., Black activists in Claiborne County, Mississippi, organized a boycott of white-owned businesses when local civic and business leaders refused to assent to demands for equality and racial justice. 458 U.S. at 899-900. "The boycott was supported by speeches and nonviolent picketing." Id. at 907. Additionally, "store watchers" stood outside

27

the targeted businesses and took down the names of those who violated the boycott.  Id. at 903-04.  Those names were then "read at meetings of the Claiborne County NAACP and published in a mimeographed paper entitled the 'Black Times.' . . .  [T]hose persons were branded as traitors to the [B]lack cause, called demeaning names, and socially ostracized."  Ibid.  In very public speeches, an organizer stated that violators would be "disciplined," and warned:  "If we catch any of you going in any of them racist stores, we're gonna break your damn neck."  Id. at 902.  The boycott went on for years, during which several decentralized acts of violence occurred, including shots fired into the homes of boycott violators, beatings, property damage, and threatening phone calls.  Id. at 904-06.

The Supreme Court ruled that the speech, both identifying and castigating boycott violators and promising retribution, was protected by the First Amendment.  Id. at 915, 929.  The Court explained that even speech designed to prompt others to act through "social pressure and the 'threat' of social ostracism . . . . does not lose its protected character . . . simply because it may embarrass others or coerce them into action."  Id. at 910.  Even the organizer's speech, which invoked the specter of violence and "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence," was protected because "mere advocacy

A-0305-21

of the use of force or violence does not remove speech from the protection of the First Amendment." Id. at 927-29. The Court noted that no actual violence occurred directly following the statements, and there was "no evidence—apart from the speeches themselves—that [the organizer] authorized, ratified, or directly threatened acts of violence." Id. at 929. The Court cautioned that if such acts of violence did occur, there might be a question of whether the organizer was derivatively liable, but until then, the speech retained its protected status. Id. at 928-29.

Similarly, in Organization for a Better Austin v. Keefe, 402 U.S. 415, 415-16 (1971), the Court addressed "a racially-integrated community organization['s]" actions "to 'stabilize' the racial ratio in the . . . area" by influencing a real estate broker who allegedly engaged in "blockbusting" or "panic peddling" tactics to scare white owners out of Chicago's Austin neighborhood. Id. at 415-16. The broker acted as the fleeing sellers' agent to profit from the transactions. Ibid. In an effort to curtail the practice, the organization began a campaign against the broker. Id. at 417. The organization traveled to the broker's hometown, some seven miles from Austin, and began distributing leaflets that were critical of the broker's practices. Id. at 415-17. Some leaflets "requested recipients to call [the broker] at his home phone number and urge him" to sign an agreement to stop

his real estate practices.  Id. at 417.  One leaflet promised to stop the campaign once he signed the agreement.  Ibid.  The organization distributed the leaflets at a shopping center, passed them to parishioners on their way home from the broker's church, and left them at the homes of the broker's neighbors.  Ibid.

Finding that the organization's activities were an "invasion of privacy," the state courts enjoined the organization from distributing the leaflets or picketing in the broker's hometown.  Ibid.  The appellate court reasoned that the activities were "coercive and intimidating, rather than informative and therefore . . . not entitled to First Amendment protection."  Id. at 418.  The Supreme Court reversed, concluding that the organization's activities were protected by the First Amendment.  Id. at 419-20.  The Court emphasized that the fact that the organization's intent was "to exercise a coercive impact on [the broker] does not remove" the First Amendment's protections.  Id. at 419.  Additionally, since the injunction was "not attempting to stop the flow of information into [the broker's] household, but to the public," the invocation of the broker's right to privacy was unavailing.  Id. at 419-20.

In general, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  Ashcroft v. Free Speech Coal., 535 U.S. 234, 253 (2002).  "The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite

30

future time.'"  Ibid. (quoting Hess v. Indiana, 414 U.S. 105, 108 (1973)). Thus, "[w]here a call to others to act neither conveys a plan to act nor is likely to produce imminent danger, it may not be criminalized, despite its unsettling message."  Carroll, 456 N.J. Super. at 543.  Although there is a narrow exception for speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action," Brandenburg v. Ohio, 395 U.S. 444, 447 (1969), we have acknowledged that "[e]ven urging others to violence is shielded unless the statement is designed and likely to produce immediate action." Carroll, 456 N.J. Super. at 545.

In Brandenburg, the Supreme Court reversed the conviction of a Ku Klux Klan leader for statements made at a rally.  395 U.S. at 444-45.  At the rally, a group of hooded Klansmen, several carrying firearms, gathered around a burning cross.  Id. at 445-47.  Following a series of anti-Black and antisemitic remarks and slurs from the group, a single individual began to speak.  Id. at 446.  Among other things, he said:  "[I]f our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic] taken."  Ibid. He promised to march on Congress and elsewhere on July Fourth.  Ibid.

The speaker was convicted of violating a statute which proscribed "advocat[ing] . . . the duty, necessity, or propriety of crime, sabotage, violence,

31

or unlawful methods of terrorism as a means of accomplishing industrial or political reform."  Id. at 445 (alteration in original).  The Supreme Court summarily invalidated the statute, explaining that the "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  Id. at 447.  "[C]onviction for mere advocacy, unrelated to its tendency to produce forcible action," is unconstitutional because it "intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments."  Id. at 447 n.2, 448.

In United States v. Carmichael, 326 F. Supp. 2d 1267, 1285 (M.D. Ala. 2004), the court explained that a "general history" of violence was insufficient to vitiate First Amendment protections.  In that case, a criminal defendant facing drug distribution charges published a website with the putative goal of spreading awareness of his case and seeking information about individuals involved.  Id. at 1271-72.  The website displayed names and photographs of individuals labeled as "Agents" and "Informants" beneath a caption reading, "Wanted," in large, red letters.  Id. at 1272.  The government sought a protective order requiring the defendant to remove the website from the internet on the ground that the website constituted harassment of the

A-0305-21

government's witnesses or served to intimidate or threaten the witnesses. Id. at 1274. At an evidentiary hearing, a witness called by the government testified that the terms "wanted" and "informant" were "threatening" because the term "informant" had a "bad connotation among criminals and is equivalent to 'snitch.'" Id. at 1275. The witness also suggested that "the website [was] meant to encourage others to inflict harm" on informants and agents. Id. at 1286.

Specifically citing four cases decided by federal circuit courts in the prior two years for context, the court acknowledged "numerous cases involving the murder of informants in drug-conspiracy cases." Id. at 1284. Nevertheless, the court explained that the proper focus of the inquiry was defendant's website itself, "not whether the site calls to mind other cases in which harm has come." Id. at 1285. Thus, while the court acknowledged that the "broad social context ma[de] the case closer," the "background facts" relied upon by the government were too "general" to rob the website of its First Amendment protections, particularly since the court could not find that the website served "no legitimate purpose" or "cross[ed] the line separating insults from 'true threats.'" Id. at 1278, 1282.

As to the latter, the court acknowledged that "'true threats' are not protected by the First Amendment." Id. at 1280 (quoting Virginia v. Black,

33                                                                    A-0305-21

538 U.S. 343, 359 (2003)); see also Watts v. United States, 394 U.S. 705, 707 (1969) (originating the true threats doctrine). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. "The 'prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.'" Carmichael, 326 F. Supp. 2d at 1280 (quoting Black, 538 U.S. at 360). However, "evidence of an atmosphere of general intimidation is not enough to find . . . a 'true threat.'" Id. at 1285.

Applying these principles, we are convinced that the video, whether viewed on its own or in the context in which it was disseminated, does not fall outside the First Amendment's protection. The judge concluded that the video was not protected by the First Amendment because members of the Jewish community would respond violently to plaintiff being identified as a get refuser. The judge stated that "[t]he First Amendment cannot protect this type of communication to incite, which is clearly invasive of [plaintiff's] safety and privacy." However, such an unspecified general history of violent treatment to which get refusers were subjected was insufficient to render defendant's video a true threat or an imminent danger to satisfy the incitement requirement. On the contrary, in Epstein, the

court explained that disseminating the names of get refusers "so that the reading public will hold them in disrepute," and otherwise taking steps to "shun and embarrass a recalcitrant husband . . . do[es] not violate the criminal laws of the United States." 91 F. Supp. 3d at 582.

Critically, the First Amendment "does not prohibit name[-]calling" and "protects 'vehement, caustic, and sometimes unpleasantly sharp attacks' as well as language that is 'vituperative, abusive, and inexact.'" Carmichael, 326 F. Supp. 2d at 1282 (quoting Watts, 394 U.S. at 708). Similarly, "threats of vilification or social ostracism" do not lose their protected status. Claiborne Hardware Co., 458 U.S. at 910. If the literal threat "to break . . . necks" in Claiborne, against a backdrop of actual acts of retaliation and violence committed by boycott supporters against boycott violators, was not outside the First Amendment's protection, it is hard to see how defendant's video, with, at most, only nonspecific threatening connotations, could be unprotected. Id. at 902.

The judge's suggestion that plaintiff had a right to not be subjected to anonymous phone calls, threats, or picketing at his house—especially absent evidence that defendant made calls herself or distributed plaintiff's contact information—is likewise insufficient to render defendant's speech unlawful. Only the #FREE[L.B.B.] photo image, which the judge did not attribute to defendant, identified plaintiff's hometown, not the video. Moreover, there was no direct

35

evidence of a link between the creation of the video, the dissemination of the video, and plaintiff's receipt of anonymous phone calls. In any event, the acts of identifying an individual, encouraging others to call them and urge them to change their behavior, and picketing in their hometown are protected activities under <u>Keefe</u>, 402 U.S. at 417, 419.

Although the judge found that <u>get</u> refusers, like plaintiff's father, were at risk of imprisonment, there is no such offense in our penal code. Israeli courts—where marriage and divorce are governed exclusively by religious law—retain the power to impose sanctions including fines or jail sentences for <u>get</u> refusal. Jodi M. Solovy, <u>Civil Enforcement of Jewish Marriage and Divorce: Constitutional Accommodation of a Religious Mandate</u>, 45 DePaul L. Rev. 493, 501 n.59 (1996). "Israeli law gives rabbinical courts the authority to issue certain sanctions to pressure a non-consenting spouse to give consent to a <u>get</u>." <u>Ben-Haim v. Edri</u>, 453 N.J. Super. 526, 530 (App. Div. 2018). No such risk exists in state courts, as it is a fundamental principle that civil courts may not become entangled in religious proceedings "if resolution requires the interpretation of religious doctrine." <u>Ran-Dav's Cnty. Kosher v. State</u>, 129 N.J. 141, 162 (1992); <u>see also</u> <u>Satz v. Satz</u>, ___ N.J. Super. ___, ___ (App. Div. 2023) (slip op. at 16-18) (rejecting the ex-husband's argument that the trial court violated his First Amendment rights by enforcing the provisions of a marital settlement agreement, rather than a religious

36

contract, in which the parties agreed to participate in a <u>beth din</u> proceeding to obtain a <u>get</u> that the ex-wife sought).

Because calls to exhort social pressure on plaintiff would necessarily fall under the aegis of First Amendment protection and the specter of imprisonment for refusing a <u>get</u> is unrealistic, harassment must be found—if at all—in the threat of violence. However, the judge's conclusion that such threats were real and imminent is simply not supported by the record. First Amendment protections cannot be vitiated on unsubstantiated findings of fact. The video itself, which was not even directed to plaintiff, contained no overt call for or reference to violence. <u>See</u> <u>Carroll</u>, 456 N.J. Super. at 539 (citing <u>United States v. Dinwiddie</u>, 76 F. 3d 913, 925 (8th Cir. 1996)) (listing "whether the threat was communicated directly to its victim" as among the indicia of a "true threat"). Even an overt invocation of violence, however, would be insufficient to strip the statement of First Amendment protection. <u>See</u> <u>Claiborne Hardware Co.</u>, 458 U.S. at 902; <u>Brandenburg</u>, 395 U.S. at 446-47.

Instead, to qualify as incitement and lose First Amendment protection— as the judge tacitly found—a communication must be both "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action." <u>Brandenburg</u>, 395 U.S. at 447. However, such is not the case on this record. The difference between lawful and lawless action "may be identified

37

easily by reference to its purpose." Claiborne Hardware Co., 458 U.S. at 933. Defendant's ultimate objective was unquestionably legitimate—it was to get a get. We are persuaded that under the circumstances of this case, the means employed by defendant to achieve her goal is entitled to First Amendment protection.

Of course, should plaintiff ever be subjected to the threat of violence at the hands of a third party, he will not be without recourse. In Stimler, a small group of rabbis were convicted of kidnapping-related charges when, ostensibly on behalf of agunot, they "worked with 'tough guys' or 'muscle men' in exchange for money to kidnap and torture husbands in order to coerce them to sign . . . gittin." 864 F.3d at 259-60. Thus, as evidenced in Stimler, the violent, unlawful pursuit of gittin can be prosecuted. 864 F.3d at 259. But "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." Bartnicki v. Vopper, 532 U.S. 514, 529 (2001). "[I]t would be quite remarkable to hold that speech by a law-abiding [speaker] . . . can be suppressed in order to deter conduct by a non-law-abiding third party." Id. at 529-30.

In sum, the judge's finding that the Jewish community was prone to violence against get refusers—and the implicit holding that defendant was aware of and intentionally availed herself of such violent tendencies—is not

A-0305-21

supported by the record. The video was intended to get a get. The video did not threaten or menace plaintiff, and nothing in the record suggests that plaintiff's safety or security was put at risk by the video. Neither plaintiff's testimony that his father had been beaten for being a get refuser at an unspecified time and place nor defendant's vague testimony that plaintiff's father had been imprisoned for being a get refuser sufficed.

Without credible evidence that the video incited or produced imminent lawless action or was likely to do so, defendant's speech does not fall within the narrow category of incitement exempted from First Amendment protection. Likewise, because the judge's finding of a privacy violation relied upon the same factual finding, the record does not support the finding that the manner of defendant's communication violated subsection (a) of the harassment statute. As our Supreme Court explained, N.J.S.A. 2C:33-4 criminalizes only those "private annoyances that are not entitled to constitutional protection." Hoffman, 149 N.J. at 576. Defendant's communication does not meet that criteria.

Therefore, we reverse the April 22, 2021, and August 27, 2021, orders. In so doing, we vacate the FRO and the restraints contained therein as well as the counsel fee award. In light of our disposition, the TRO should not be reinstated and we need not address defendant's or amici curiae's remaining arguments.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0305-21