# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3563-21

K.E.M.,

      Plaintiff-Respondent/
Cross-Appellant,

v.

S.R.A.,

      Defendant-Appellant/
Cross-Respondent.

_____

Argued January 31, 2024 – Decided March 1, 2024

Before Judges Firko and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FV-14-0908-22.

John P. Graves argued for appellant/cross-respondent S.R.A. (Graves Andrews, LLC, attorneys; Sabrina M. Andrews, on the briefs).

Steven Robert Catanzaro argued for respondent/cross-appellant K.E.M. (Day Pitney LLP, attorneys; Steven Robert Catanzaro and Amberly Nicole Antebi, on the briefs).

PER CURIAM

Defendant S.R.A.[1] appeals from a June 7, 2022 final restraining order (FRO) and a December 13, 2022 amended final restraining order (amended FRO) entered against him, in favor of plaintiff K.E.M., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Based on our careful review of the record and application of established PDVA law, we vacate the amended FRO entered sua sponte by the trial court on December 13, 2022, during the pendency of this appeal, and reinstate and affirm the June 7, 2022 FRO since we find plaintiff established the predicate act of cyber harassment, N.J.S.A. 2C:33-4.1, as well as the need for protection from defendant.

I.

On May 4, 2022, the court entered a temporary restraining order (TRO) to protect plaintiff from defendant based upon the predicate act of cyber harassment. On May 24, 2022, an amended TRO was entered specifying that the predicate acts were assault, terroristic threats and cyber harassment. On May 25, 2022, a second amended TRO was entered specifying that the predicate acts

___

[1] We use initials to protect the privacy of the parties and the confidentiality of these proceedings. See Rule 1:38-3(d)(10).

were assault, terroristic threats, harassment and cyber harassment. On the same date, the court adjourned the hearing on the FRO to May 31, 2022 on the record with all parties and counsel present and entered a memorializing continuance order confirming the second amended TRO remained in effect pending further order.

On June 7, 2022, the court held a hearing on the application for a FRO (the FRO hearing) at which both parties testified and moved items into evidence. During the FRO hearing, counsel for plaintiff specified on the record that the proceeding was to consider the entry of a FRO as to the predicate acts of assault, cyber harassment and terroristic threats.

At the conclusion of the FRO hearing, the court entered the requested FRO, finding plaintiff proved by a preponderance of the evidence the predicate acts of harassment and cyber harassment and the need for the entry of a FRO to protect her from defendant. Defendant appealed. After the notice of appeal was filed, the court sua sponte entered an amended order on December 13, 2022, modifying its finding on the predicate act to grant the FRO based on harassment only. Plaintiff filed a cross-appeal as to the December 13, 2022 amended FRO.

A-3563-21

II.

We recount the salient facts from the June 7, 2022 hearing, which culminated in the entry of the FRO. The hearing record before us establishes that plaintiff and defendant were engaged in an on-again, off-again relationship spanning from 2017 to 2022. When the relationship began, plaintiff was fourteen years old and defendant was almost eighteen years old.[2]

The parties sporadically spent time together which included non-traditional consensual sexual activities, one specifically known as "trampling."[3] Defendant posted videos of their "trampling" sessions on Instagram. Plaintiff did not give defendant permission to post the videos on social media and complained to him that the comments his followers left about her body caused her to be uncomfortable. However, defendant continued to post the videos.

Plaintiff alleges that defendant told her he had self-diagnosed dissociative identity disorder (DID), with two specific alter egos—Michael and Lucifer. Plaintiff testified that defendant explained Michael "was a very angry guy who was [thirty-eight] years old," and Michael "ha[d] tried to kill [her] on several

_____

[2] As of the June 7, 2022 FRO hearing, plaintiff was nineteen years old and defendant was twenty-two.

[3] The record establishes that the reference to "trampling" meant plaintiff would step on defendant's upper body while he masturbated.

4

occasions." Plaintiff testified she was diagnosed with bipolar disorder when she was fourteen years old. Defendant later admitted to the court that he did not have DID and claimed, "I have never once stated that I have it."

Plaintiff testified that their relationship suffered from a history of domestic violence incidents that occurred between May 4, 2019, and April 2022. During the FRO hearing, plaintiff testified that the first of such incidents occurred when she playfully swatted around defendant's face in a teasing fashion and he then "put his [closed] fist out in front of [her] face" and made contact. Plaintiff testified "[i]t immediately brought tears to [her] eyes and [she] started crying."

Later that same day after spending more time together, plaintiff again playfully swatted around his face, and defendant slapped her on the side of her face "almost as a warning shot." Plaintiff described the form of the slap to be between an action to make her stop swatting at him and "someone actually going to continue to hurt [her]." The slap caused her eyes to begin "welling with tears again" and she cried. Plaintiff testified that defendant did not show any remorse or emotion and simply "[d]id not care," so plaintiff left. Defendant tried to justify his actions by stating that he slapped plaintiff in the face because "[s]he had brought a person over to the house and was planning to and actually

5

proceeded to have sex in [his] bedroom and kicked [him] out of [his] own room." Defendant testified that on this occasion he was mad because plaintiff had sex with someone else.

The third prior incident of non-consensual violence occurred in August 2019 surrounding sexual activity. Defendant drove ninety minutes to the apartment where plaintiff was living with her mother, as he had eight or nine other times. When he arrived, he spoke with plaintiff and her mother and then the pair retired into plaintiff's bedroom and locked the door. They spent some time together watching videos before engaging in sexual activity. Plaintiff recalled that she had asked defendant to "put his hands around [her] throat," as he had done on other occasions at her request. Defendant suddenly grabbed plaintiff's throat "as hard as he could possibly grab" in a way he had never done before to the extent that plaintiff "was actually in fear that [she] could not breathe." Plaintiff noted she was "gasping for air and [she] was panicking" while she attempted to push defendant off her for "what felt like a lot longer than fifteen seconds."

After defendant let go of her neck, plaintiff "immediately sunk to the floor and . . . started hysterically crying because that had just really scared [her]." She asked him why he did that, and he did not respond at all to her question or her

6

distress regarding the incident. Plaintiff asked him to leave, and he asked why. After defendant left, she told her mother and started crying but did not call the police. Defendant testified he used that amount of force because "[s]he continuously would always complain . . . I would start out slow."

The fourth incident occurred on October 31, 2020. Defendant drove ninety minutes to plaintiff's house, picked her up during the evening and brought her to a park by her house. While they were at the park, suddenly without warning or saying anything, defendant "grabbed a handful of the hair on top of [her] head and ripped [her] neck to the left making the entire side of [her] right neck crack" and tore the hair from her head. She reacted by saying, "what the f*ck, you can kill me–you can kill someone by doing that." Defendant responded by demonstrating the true way he could actually kill someone in that manner. After the incident, plaintiff remained in the park with defendant and they engaged in trampling because "he would get angry when [they] wouldn't do sexual things." Defendant testified that he never grabbed plaintiff's hair "unless it was specifically asked of [him]," explaining that it was like a "bargaining system" meaning plaintiff would step on him, and he would do something back, like pulling her hair or choking her.

7

The fifth incident occurred on April 19, 2022, when plaintiff arranged for them to hang out at one of her friend's homes because her friend wanted to see defendant "switch" into "one or a few of the alter egos." Defendant drove ninety minutes to plaintiff's friend's home where the friends proceeded to hang out for about an hour or so having fun. Plaintiff swatted playfully around defendant's face without touching him when he again mentioned his alter-ego Michael, who had tried to kill plaintiff several times. Plaintiff testified that he grabbed her "wrist with his left hand and with his right hand, he reached into his pocket and pulled out a pocketknife, flipped it open, and held it . . . against his stomach pointing [it] at [her]," stating "back the f*ck up," which scared her.

The trial court found plaintiff's testimony to be more credible than defendant's, though it noted several places where neither party seemed fully credible. The court rejected defendant's testimony that he "jokingly pulled the knife out of [his] back pocket, didn't open it, and said back up." The trial court would not consider plaintiff's testimony of additional incidences of alleged physical abuse that were not identified in the TRO applications.

Plaintiff testified the first incident of cyber harassment occurred on May 2, 2022, through an Instagram conversation between herself and defendant where she sent him a meme depicting a fictional character with DID. The

8

conversation broke out into a fight about defendant being a liar and then defendant threatened by text, "[a]lso it's Michael so I'd drop the tone if you don't want to fight." Plaintiff responded, "[y]ou're so annoying," and then defendant responded, "[y]ou're the definition of bipolar, what's your point?" And he later commented that it's "[s]till Michael." Plaintiff testified that she understood defendant's comments about Michael to mean he was very angry.

Defendant then reinitiated the conversation through a text message exchange where the discussion about his deceit continued. Plaintiff accused defendant of lying about having DID, to which he responded, "had it since I was [eight,] first of all. And, secondly, just didn't let any of them out because I didn't know it was normal and I wasn't going crazy." Later in the conversation, plaintiff responded that defendant "need[ed] a Xanax" because he was "acting bat sh*t crazy." The conversation then shifted to plaintiff accusing defendant of making fun of her bipolar disorder. Plaintiff testified that defendant's nickname for her was "[b]ipolar [b]ear."

Defendant's online activity with respect to plaintiff then shifted to Facebook. Defendant's May 2, 2022 Facebook post reads as follows:

> I was just told to overdose on Xanax because I've got a mental illness. I love this world sometimes. I'm sorry you didn't have a father figure growing up and you think every man is trying to hurt you, but I've been diagnosed

with this since I was [eight], so I don't know what to tell you, c*nt.

At the FRO hearing, defendant denied having a mental illness and admitted he was not told to overdose on Xanax by plaintiff.

Plaintiff testified that c*nt is something defendant would typically call her as it is a "very big word in his vocabulary." She also noted that the post, the comments under the post, and defendant's responses to those comments made her "very upset."

Plaintiff testified regarding Facebook messages that were sent to her from defendant's brother. Defendant's brother messaged plaintiff on Facebook that she "[r]eally shouldn't tell people to [overdose] on drugs you sl*g," and "I hope you lose friends to drugs if you think it's funny to joke like that. Be gone." Defendant then went back to Facebook to post "[o]h, look at that. She reported my post because I called her out. Don't threaten people and you won't be called a POS."[4] Plaintiff testified that the post made her upset "[b]ecause he's still talking about the situation when [she] never . . . told him to [overdose]. And then he's just causing trouble on Facebook."

_____

[4] POS stands for "piece of sh*t."

A-3563-21

Plaintiff testified that defendant's Facebook posts continued. On May 3, 2022, he wrote, "[d]ude, what? So apparently I pulled a knife on her, guys. Oh, no. I think I would remember something like that." She noted again that all the posts made her feel "very upset" and she felt, "[e]mbarrassed, targeted because [she] was getting called all these vulgar names and having fake comments made about [her] when they were not true."

Defendant's online conduct even continued after plaintiff's TRO was issued. On May 25, 2022–within minutes of the first scheduled hearing being adjourned and while the TRO was in effect—defendant posted about plaintiff on Snapchat after leaving the courthouse. In the post, defendant calls plaintiff a "c*nt," and lied that he was in court because he refused to "sleep with her."

Plaintiff testified she was afraid of defendant because he knows exactly where she lives, has driven ninety minutes to her home eight or nine times, has been physically violent to her, and she believed she needed to keep herself and her family safe from him. Plaintiff was also afraid because defendant "owns several swords, one or two [k]atanas" and his father owns over twenty guns, all of which she has seen. Finally, plaintiff testified that she felt like defendant was cyber harassing her after the Facebook posts and messages from defendant and his brother started:

> That's what drove me towards feeling unsafe and that I know he knows where I live and that he can come and hurt me at any time. If he's going to now tell the internet and lie and make all these false accusations against me, I mean, it shows that he's not a safe person.

Defendant admitted all of his social media posts came from a place of anger, and that he knew they would make plaintiff feel "terrible." Defendant also testified that while he gave his brother plaintiff's social media account name, and informed him about the Xanax comment, he "didn't expect him to actually go ahead and do that" to her.

Overall, defendant admitted that he used these social media posts to calm his nerves, even though he knew it was at plaintiff's expense. Defendant agreed that the nature of social media is that anybody in the world can see the posts.

## III.

At the conclusion of the June 7, 2022 FRO hearing, the trial court issued an order and rendered an oral decision concluding that the preponderance of the credible evidence in the record supported a finding of the predicate acts of

A-3563-21

harassment and cyber harassment[5] and that a FRO was necessary to protect plaintiff. The trial court found that it could not "ignore somewhat of a grooming aspect to this case given the age difference between the parties and the fact that this relationship commenced apparently when . . . plaintiff was approximately [fourteen] or [fifteen] years old." The trial court also made credibility determinations on the record finding:

> generally . . . plaintiff testified in a rather matter-of-fact straightforward manner. She was consistent in her testimony. She gave up certain facts or information when confronted during the lengthy cross-examination. She acknowledged that perhaps it didn't make sense to an objective observer why it was that this relationship continued over the course of time.

The trial court found defendant was not as credible and specified that, defendant "didn't raise his head a lot, kept his head down," he "blanketly denied anything . . . that occurred," and he "clearly lied" about his statements regarding the alternate personalities, Michael and Lucifer.

The trial court concluded there was jurisdiction under the PDVA to enter the FRO based on the factual finding that the parties were intimate with each other over a several-year period. As to cyber harassment, the court found

---

[5] The transcript of the court's oral decision centers on the predicate act of cyber harassment. However, the written order also finds harassment as a predicate act.

13

"[plaintiff] credibly testified that she felt embarrassed and targeted [by] the names that she was referred to, those vulgar names through Facebook and the like." The court found that defendant gave his brother plaintiff's contact information for "the purpose of allowing a third party to embarrass, humiliate or harass her through social media." He also found that plaintiff testified that she was afraid of defendant as he had been physically violent and drove to see her eight or nine times, satisfying the second Silver[6] prong. The trial court found that plaintiff needed protection for her own best interests stating, "it's almost as if [o]n some level, she needs to be protected from herself."

Overall, the trial court concluded that the varying posts and Snapchats "[rose] to the level of purposely attempting to annoy, embarrass or harass someone through the use of cyber tech or cyber technology, and does satisfy the predicate act requirement." The court found a FRO was necessary to "prevent further acts of domestic violence or abuse," and concluded:

> given the various and multiple credibility issues with the defendant in this case, given the physical nature of some of the prior contacts between the parties, given the obfuscation and lies of the defendant as it pertains to the purposes behind what occurred on or about May 4[] or the like, and given his actions in part while this matter was pending, which, arguably, is . . . violative of the TRO . . ., [the court] will enter a [FRO].

---

[6] Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

On July 21, 2022, defendant filed a notice of appeal. On August 8, 2022, defendant filed an amended notice of appeal to correct a deficiency pursuant to Rule 1:4-1.

On December 13, 2022, the trial court sua sponte issued an amended order granting the FRO with an accompanying supplemental statement of reasons. The amended order sets forth "[w]hile the [c]ourt finds sufficient evidence to support a finding that . . . [d]efendant violated the relevant harassment statutes, it limits its findings to exclude a violation of the cyber harassment statute, N.J.S.A. 2C:33-4.1, as a predicate offense." On December 14, 2022, the trial court advised us by letter that the supplemental materials were submitted pursuant to Rule 2:5-6(c).

In the statement of reasons accompanying the December 13, 2022 amended FRO, the trial court set forth that the FRO hearing record supported a finding of the predicate act of harassment based on "[d]efendant's history of physical and verbal abuse coupled with his lack of credibility, extremely vulgar Facebook posts, Snapchat story, and brother's Instagram messages." The court reiterated that plaintiff "needs protection from [d]efendant's abusive words, actions, and presence" in order "to protect [her] from future abuse," and that defendant made her "fearful for her life." The court again set forth that it

determined the plaintiff's testimony at the FRO hearing to be far more credible than defendant's, finding that defendant blatantly lied on the stand multiple times about his self-diagnosed mental illness and the history of his relationship with plaintiff. The trial court found that defendant's statements were not speech protected under the First Amendment. The court also eliminated cyber harassment as a basis for the entry of the FRO since it felt it did not conduct a thorough analysis and findings on that predicate act.

On December 14, 2022, defendant filed a second amended notice of appeal to include the court's December 13, 2022 amended order. On December 29, 2022, plaintiff filed a notice of cross-appeal.

IV.

Appellate review of a trial court's decision to enter a FRO in a domestic violence matter is limited. Peterson v. Peterson, 374 N.J. Super. 116, 121 (App. Div. 2005). "A reviewing court is bound by the trial court's findings 'when supported by adequate, substantial, credible evidence.'" Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "This deferential standard is even more appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523, 533 (App. Div. 2011) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A trial

16

judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008).

Further, we "accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). "Reversal is warranted only when a mistake must have been made because the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Invs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we review de novo "the trial judge's legal conclusions, and the application of those conclusions to the facts . . . " Ibid. (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

V.

On appeal, defendant argues the trial court erred in amending the FRO during the pendency of this appeal; the trial court improperly considered the predicate act of harassment despite its absence in plaintiff's original complaint;

defendant's conduct did not meet the statutory requirements to be considered cyber harassment; plaintiff cannot use the conduct of defendant's brother in support of a FRO against defendant; plaintiff has not shown the need for a FRO to protect her from future abuse; the trial court did not sufficiently support its order with a statement of reasons; and his First Amendment rights have been infringed upon. In response and on cross-appeal, plaintiff contends the record supports the trial court's finding for the predicate act of cyber harassment and the FRO is needed to protect plaintiff from future harm.

VI.

We first address whether the December 13, 2022 amended FRO offended defendant's due process rights since it was based upon a predicate act not alleged by plaintiff in her TRO complaint and specified by plaintiff as not being the subject of the FRO hearing. We have held that "[i]t offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing." Dep't of L. & Pub. Safety, Div. of Motor Vehicles v. Miller, 115 N.J. Super. 122, 126 (App. Div. 1971). "[D]ue process forbids the trial court 'to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint.'" J.D. v. M.D.F., 207 N.J. 458, 478 (2011)

(quoting H.E.S v. J.C.S., 175 N.J. 309, 322 (2003)); see also L.D. v. W.D., Jr., 327 N.J. Super. 1, 4 (App. Div. 1999).

Although plaintiff's TRO complaint initially set forth the sole predicate act of cyber harassment, on May 24, 2022, an amended TRO was entered adding assault and terroristic threats as the bases for relief. A second amended TRO was entered on May 25, 2022, along with the continuance order. The boxes on the second amended TRO were checked off for the predicate acts of assault, terroristic threats, harassment and cyber harassment. Plaintiff contends the harassment box was checked off in error by a clerk. Despite these amendments, during the June 7, 2022 FRO hearing, counsel for plaintiff specified on the record that the trial regarded the allegations of assault, cyber harassment and terroristic threats. No other causes of action were identified on the record nor does plaintiff contend that she attempted to prove any other predicate act.

At the conclusion of the June 7, 2022 hearing, the court entered a FRO, finding plaintiff proved by a preponderance of the evidence the predicate acts of harassment and cyber harassment and the need for the entry of a FRO to protect her from defendant. The sua sponte December 13, 2022 amended FRO removed cyber harassment as a basis for the FRO, leaving only the finding of harassment as a predicate act.

19

Based on the representation on the record as to the scope of the FRO hearing, a FRO based upon predicate acts other than assault, terroristic threats and cyber harassment would be tantamount to a violation of defendant's due process rights. Therefore, to the extent that the trial court's December 13, 2022 amended FRO set forth harassment as the only predicate act, we vacate that order and turn next to consider reinstatement of the June 7, 2022 FRO. Since the December 13, 2022 amended FRO is vacated, we need not address the propriety of the trial court's sua sponte amended order entered while this appeal was pending.

We deem it appropriate in this case to exercise original jurisdiction to consider the reinstatement of the June 7, 2022 FRO pursuant to Rule 2:10-5. Original jurisdiction is "'particularly appropriate to avoid unnecessary further litigation, as where the record is adequate to terminate the dispute and no further fact-finding or administrative expertise or discretion is involved, and thus a remand would be pointless . . . .'" Price v. Himeji, LLC, 214 N.J. 263, 294 (2013) (quoting Vas v. Roberts, 418 N.J. Super. 509, 523-24 (App. Div. 2011)).

At the FRO hearing, both parties had a full opportunity to present their evidence and call witnesses, who were cross-examined. The trial court made credibility determinations and considered proofs on both Silver prongs. Since

the record of the FRO hearing is complete, we find it appropriate to exercise original jurisdiction to determine whether to reinstate the June 7, 2022 FRO.

We begin by acknowledging that the purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the Act] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

Under the PDVA, a "victim of domestic violence" includes "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d). Defendant contends that there is no jurisdictional basis for the entry of a FRO because the parties were never in a "dating relationship." We are unconvinced.

In S.K. v. J.H., 426 N.J. Super. 230 (App. Div. 2012), we suggested consideration of the following questions to determine whether there is a dating relationship sufficient to grant relief under the PDVA:

> 1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?

21

2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?

3. What were the nature and frequency of the parties' interactions?

4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?

5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?

6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?

[Id. at 234 (quoting Andrews v. Rutherford, 363 N.J. Super. 252, 260 (Ch. Div. 2003)).]

We have interpreted the dating relationship predicate broadly in furtherance of the protective remedial nature of the PDVA. Ibid. The parties' on and off intimate relationship spanning several years which also included recreational activities, as well as in person and electronic communications, is sufficiently established in the record to constitute a "dating relationship" pursuant to the PDVA.

The testimony at the FRO hearing established the parties were intimate over a four-year period of time. Although there were periods of time in which the parties did not see each other, such as when plaintiff was at summer camp

or dating someone else, they continued to rekindle their relationship even after months of not communicating. We find there was social interpersonal bonding of the parties over and above a mere casual fraternization by way of their physical intimacy and shared time together. In addition to their consensual sexual activities, they spent time together in other ways such as at the park, watching television or videos, hanging out with friends, getting a bite to eat and communicating through text and social media messaging.

We find that the parties' various interactions meet the low threshold of establishing a dating relationship sufficient to afford plaintiff victim status under the PDVA. The circumstances here are distinguishable from the relationship in S.K., where we concluded a single date did not constitute a "dating relationship." 426 N.J. Super. at 239. Rather, we are guided by our decision in C.C. v. J.A.H., 463 N.J. Super. 419, 432-33 (App. Div. 2020), where we set forth that the parties were in a "dating relationship" despite having never been on an in-person date given the "prevalence of virtual communications in the ever-changing world." As in C.C., "the duration and extent of the parties' in-person and electronic communications" sufficiently establishes that the parties were engaging in a "dating relationship" even if that relationship may be one that appears "peculiar" to some. Id. at 432.

Finding that plaintiff is afforded potential protection under the PDVA, we move to determining whether plaintiff has established the two prongs under Silver sufficient to reinstate the June 7, 2022 FRO. Silver, 387 N.J. Super. at 125-27. First, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. If a court finds a predicate act occurred, "the judge must [next] determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021). This is done by "an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6)." J.D., 207 N.J. at 476 (quoting Silver, 387 N.J. Super. at 127). The factors which the court should consider include, but are not limited to:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and

> (6) The existence of a verifiable order of protection
> from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a).]

"[W]hether the victim fears the defendant" is an additional factor the trial court may consider. G.M., 453 N.J. Super. at 13 (quoting Carfagno v. Carfagno, 288 N.J. Super. 424, 435 (Ch. Div. 1995)). The court must determine, pursuant to the totality of the circumstances, whether the FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127; see also N.J.S.A. 2C:25-29(b) (stating "the court shall grant any relief necessary to prevent further abuse"). The inquiry is necessarily fact specific. Silver, 387 N.J. Super. at 127-28.

Although the court is not required to incorporate all of these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 401-02 (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)). Whether a restraining order should be issued depends on the seriousness of the predicate offense, on "the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse," and on "whether immediate

danger to the person or property is present." Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995).

The court must exercise care "to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G., 449 N.J. Super. 208, 225 (App. Div. 2017). The PDVA is not intended to encompass "ordinary domestic contretemps." Corrente, 281 N.J. Super. at 250. Rather, "the [PDVA] is intended to assist those who are truly the victims of domestic violence." Silver, 387 N.J. Super. at 124.

Under New Jersey statute, a person commits the crime of cyber harassment if, while making a communication in an online capacity by means of any electronic device or any social networking site and with the purpose to harass another, the person:

> (1) threatens to inflict injury or physical harm to any person or the property of any person;
>
> (2) knowingly sends, posts, comments, requests, suggests, or proposes any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his [or her] person; or
>
> (3) threatens to commit any crime against the person or the person's property.

26

[N.J.S.A. 2C:33-4.1(a).]

"The cyber harassment statute limits the [regulation] of speech mostly to those communications that threaten to cause physical or emotional harm or damage." State v. Burkert, 231 N.J. 257, 274 (2017). In order to determine whether a communication constitutes harassment, a court does "not measure the effect of the speech upon the victim; [it] look[s] to the purpose of the actor in making the communication," even if the communication was "understandably upsetting to [the recipient]." E.M.B. v. R.F.B., 419 N.J. Super. 177, 182 (App. Div. 2011). A finding of purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). A fact finder's common sense and experience may also color the analysis. Hoffman, 149 N.J. at 577.

By way of an exercise of original jurisdiction, we find based on our review of the record before the court at the FRO hearing, accepting the trial court's credibility determinations, plaintiff established by the preponderance of the credible evidence that defendant committed the predicate act of cyber harassment. Defendant's Instagram communication from his angry alter-ego,

27

Michael, constitutes a threat to harm plaintiff when viewed through the prior history of defendant relaying to plaintiff that Michael tried to kill her on several occasions. We find that there is sufficient credible evidence in the record that defendant used Instagram messaging to threaten plaintiff and inflict her with fear of physical injury.

The Facebook messages between defendant's brother and plaintiff, which the trial court found were at defendant's behest, also constitute cyber harassment. By way of a social media post, defendant's brother informed plaintiff that he "hope[d] [she'd] lose friends to drugs," told her to "[b]e gone" and "get medicated biiiitcg." While defendant tries to avoid legal responsibility by claiming he is not liable for the conduct of his brother, the trial court's determination that defendant allowed his brother as a third party to embarrass, humiliate or harass plaintiff through social media is supported by credible evidence. Defendant lied to his brother by telling him that plaintiff wanted him to overdose on Xanax, and then gave his brother plaintiff's personal social media account information—a means to contact plaintiff and send threatening messages. We agree with the trial court that this demonstrates defendant solicited his brother to send messages that would threaten and inflict fear in

28

plaintiff, and is an additional basis for finding the predicate act of cyber harassment.

Defendant's posting of a message on Snapchat to threaten and inflict fear in plaintiff within minutes of the first FRO trial date being adjourned also constitutes cyber harassment. Defendant posted a Snapchat that referred to plaintiff as a "major c\*nt" and noted he was in court because he wouldn't sleep with her, which defendant admitted he knew was a lie when he posted.

The record establishes that defendant's social media postings were purposefully geared towards threatening and inflicting fear and pain to plaintiff. At the FRO hearing, defendant admitted his use of social media came from a place of anger. Defendant also admitted that he knew his posts would make plaintiff feel terrible, but purposely continued at her expense. Accordingly, the record from the FRO hearing supports the conclusion that plaintiff has established by the preponderance of the credible evidence cyber harassment as the predicate act under N.J.S.A. 2C:33-4.1(a)(1).

Once the court finds defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126. While the second inquiry "is most often perfunctory and self-evident, the

29

guiding standard is whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also J.D., 207 N.J. at 475-76. "The second prong set forth in Silver requires [that] the conduct [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27); see also Peranio, 280 N.J. Super. at 52 (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims").

We also find the second Silver prong has been established in that a FRO is necessary to protect plaintiff from future acts of domestic violence based on plaintiff's credible testimony that she was fearful of defendant, who had purposefully tried to physically harm her on prior occasions and had the opportunity to do so in the future. We consider the previous history of domestic violence between the parties, the threats of danger to plaintiff and plaintiff's best interests as a victim of domestic violence.

The multiple prior acts of domestic violence between the parties that occurred outside of their intimate interactions are engrained in the fabric of their multi-year relationship. Plaintiff testified that defendant's fist has made contact with her face, defendant has slapped plaintiff, defendant has choked plaintiff harder than requested, and defendant has pulled plaintiff's hair so hard that her

neck cracked and her hair ripped out of her scalp. The record in this case clearly depicts a history of physical violence between the parties, which weighs in favor of the entry of a FRO to protect against future abuse.

The testimony at the FRO hearing established plaintiff is afraid of defendant. See G.M., 453 N.J. Super. at 13 (noting that "whether the victim fears the defendant" is an additional factor the trial court may consider (quoting Carfagno, 288 N.J. Super. at 435)). During the hearing, plaintiff confirmed that she was in fact afraid of defendant because he knows where she lives and has been physically violent to her. We defer to the trial court's credibility determinations based upon the testimony at the hearing. We are convinced based upon the credible evidence in the record that a FRO is necessary to protect plaintiff and her family from defendant.

Defendant attempts to diminish plaintiff's claim that there is an immediate danger to person or property by noting the parties no longer live close together and he has no desire to have contact with her moving forward. We are unconvinced. The entire history of the parties' relationship evidences that it is typical for them to have periods of no contact before they randomly desire to rekindle their connection. We agree that geographic proximity of the parties is irrelevant here as defendant previously drove ninety minutes eight or nine times

31

to see plaintiff when they were living farther apart. Additionally, due to the unbridled nature of social media, defendant can cyber harass plaintiff from anywhere in the world.

Our consideration of the FRO hearing record, along with the trial court's credibility findings, and an evaluation of applicable factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), as required by prong two of Silver, supports entry of a FRO based on cyber harassment.. Therefore, we reinstate the June 7, 2022 FRO based upon the predicate act of cyber harassment, pursuant to the totality of the parties' circumstances, finding that a FRO is necessary to protect plaintiff from future danger or threats of violence from defendant.

We reject defendant's constitutional challenge, in which he contends that his speech is protected by the United States and New Jersey Constitutions and cannot form the basis of a FRO, based upon our conclusion that his statements are "true threats." "A 'true threat' includes 'statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.'" State v. Carroll, 456 N.J. Super. 520, 538 (App. Div. 2018) (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). "The First Amendment does not cover true threats so as 'to protect[] individuals from the fear of violence and from the disruption that fear

engenders, in addition to protecting people from the possibility that the threatened violence will occur.'" Ibid. (alteration in original) (quoting Black, 538 U.S. at 360).

Defendant argues that although the words he used were "undoubtedly crude and boorish," they are protected because he took steps to block plaintiff from seeing the posts. However, the posts were publicly displayed for anyone to forward to or show plaintiff. Also, not naming defendant explicitly in the posts is not dispositive in light of plaintiff's testimony, found credible by the trial court, that she felt embarrassed and targeted not only by defendant, but also by the vulgar comments on the posts that defendant was interacting with and encouraging. Defendant's constitutional rights never "encompass a right to abuse or annoy another person intentionally." State v. B.A., 458 N.J. Super. 391, 409 (App. Div. 2019) (quoting State v. Saunders, 302 N.J. Super. 509, 519 (App. Div. 1997)).

Vacated and modified in part. The June 7, 2022 FRO is reinstated. The Family Part shall enter the appropriate order.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3563-21